[No. S062850. May 28, 1998.]

In re the Marriage of MARIETTA and JACK R. LEHMAN.
MARIETTA LEHMAN, Respondent, v.
JACK R. LEHMAN, Appellant.

**COUNSEL**

Harry L. Styron for Appellant.

Bernard N. Wolf, Whiting & Rubenstein, Whiting, Rubenstein, Fallon & Ross and R. Ann Fallon for Respondent.

Barbara DiFranza and Soma F. Baldwin as Amici Curiae on behalf of Respondent.

**OPINION**

**MOSK, J.**—We granted review in this cause in order to address an important question relating to the characterization of retirement benefits as community or separate property under a so-called "defined benefit retirement plan," which specifies payments in advance in accordance with a formula that comprises factors such as final compensation, age, length of service, and a per-service-year multiplier: Does a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits under such a plan own a community property interest in the retirement benefits as enhanced? As we shall explain, we conclude that the answer is: Yes.

I

Jack R. Lehman (Husband) was born on September 3, 1940, and Marietta Lehman (Wife) was born on November 13, 1941. On June 15, 1959, he was hired by the Pacific Gas and Electric Company (PG&E). On June 11, 1960, the couple married. On May 1, 1962, he began to participate in PG&E's defined benefit retirement plan, and thereby began to accrue a right to

retirement benefits thereunder. On October 29, 1977, the couple separated. On December 19, 1978, they obtained an interlocutory judgment of dissolution of marriage from the superior court, which retained jurisdiction for purposes including the division of the community property interest in his retirement benefits at the time of retirement. On February 23, 1979, they obtained a final judgment of dissolution.

In March 1993, in order to avoid discharging certain employees, PG&E offered an enhanced retirement program, called the "Voluntary Retirement Incentive" (VRI). It described the VRI program as a "management tool" to "reduc[e] costs" by "bring[ing] our workforce in line with the needs of our changing business" through enhancement of retirement benefits by means of "two special improvements to the retirement benefit formula," namely, the crediting of three putative years of service and the waiving of the normal actuarial reduction of 18 percent for early retirement, which is designed to account for more projected payments. It stated that the "decision to participate . . . is completely voluntary." For eligibility, it required, among other things, that the employee in question had attained the age of 50, and had accumulated 15 years of service, as of December 31, 1992. Husband met the conditions. He elected to retire early at about 54⅓ years of age under the VRI program effective January 1, 1995, with enhanced retirement benefits in the amount of $3,059.30 per month—based on final compensation of $5,360.43 per month, length of service of 35.67 years, including 3 putative years, and a per-service-year multiplier of 1.6 percent. (Without the three-year putative service credit, he would have received enhanced retirement benefits in the amount of $2,802 per month; without the waiver of the normal 18 percent early retirement actuarial reduction, he would have received enhanced retirement benefits in the amount of $2,508.63 per month.) Had he waited to retire early at 55 years of age, without the 3-year putative service credit and without the waiver of the normal 18 percent early retirement actuarial reduction, he would have received retirement benefits in the amount of $2,350.39 per month—based on (presumed) final compensation of $5,360.43 per month, length of service of 33.42 years, and a per-service-year multiplier of 1.6 percent. Had he waited to retire at 65 years of age, without the 3-year putative service credit and also without any early retirement actuarial reduction (inasmuch as retirement at that age is not early), he would have received retirement benefits in the amount of $3,724.00 per month—based on (presumed) final compensation of $5,360.43 per month, length of service of 43.42 years, and a per-service-year multiplier of 1.6 percent. By electing to retire early at about 54⅓ years of age under the VRI program instead of waiting to retire early at 55 years of age, he received enhanced retirement benefits in an amount of $708.91 per month.

After Husband retired, Wife made various motions in the superior court, seeking various orders together with a determination as to characterization

that she owned a community property interest in his retirement benefits as enhanced. In response, Husband admitted that she owned such an interest in his retirement benefits, but denied that she owned one in them as enhanced. What was in contest was solely characterization, i.e., whether the enhancement was a community asset in any part, and not apportionment, i.e., to what extent the enhancement, if a community asset at least in some part, belonged to the community and separate estates. Generally following *In re Marriage of Gram* (1994) 25 Cal.App.4th 859 [30 Cal.Rptr.2d 792] (hereafter sometimes *Gram*), which had recently been decided, the superior court issued orders favorable to Wife, including the determination that, by owning a community property interest in Husband's retirement benefits, she owned a community property interest in his retirement benefits as enhanced. As to apportionment, it applied the so-called "time rule." (See, e.g., *In re Marriage of Judd* (1977) 68 Cal.App.3d 515, 522 [137 Cal.Rptr. 318]; *In re Marriage of Adams* (1976) 64 Cal.App.3d 181, 186 [134 Cal.Rptr. 298].) Under that method, the community property interest in retirement benefits is the percentage representing the fraction whose numerator is the employee spouse's length of service during marriage before separation, here 17.39 years, and whose denominator is the employee spouse's length of service in total, here 32.67 years; the separate property interest is the percentage representing the remainder of 100 percent *minus* the community property interest percentage. The superior court determined that the community property interest in Husband's retirement benefits as enhanced was 53.23 percent and that the separate property interest therein was 46.77 percent. It proceeded to award Wife, as her share, one-half of the community property interest, here 26.62 percent—which yielded her an amount of about $814.39 per month, including about $188.71 per month attributable to the enhancement. It declined to follow *Gram* to the extent that *Gram* suggested that it had to add any putative years credited to the employee spouse's service to the denominator of the time-rule fraction.

On Husband's appeal, the Court of Appeal affirmed. Husband claimed that the superior court erred in its determination as to characterization that, by owning a community property interest in his retirement benefits, Wife owned a community property interest in his retirement benefits as enhanced. Reviewing the ultimate question, as it appears, independently, the Court of Appeal concluded that the superior court was correct in its characterization. In this regard, it agreed with *Gram*. At the same time, it disagreed with the then recent decision in *In re Marriage of Frahm* (1996) 45 Cal.App.4th 536 [53 Cal.Rptr.2d 31] (hereafter sometimes *Frahm*), which it read to be in conflict. Neither Husband nor Wife claimed that the superior court erred in its determination as to apportionment of Husband's retirement benefits as enhanced between community and separate property interests through its

application of the time rule. Hence, the Court of Appeal did not address the point.

On Husband's petition, we granted review. We now affirm.

## II

■ The question before us is one of characterization of retirement benefits as community or separate property under a defined benefit retirement plan, specifically, whether a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits under such a plan owns a community property interest in the latter's retirement benefits as enhanced.

## A

■ Generally, all property acquired by a spouse during marriage before separation is community property. (See Fam. Code, §§ 760, 771.)

Under the leading case of *In re Marriage of Brown* (1976) 15 Cal.3d 838 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164] (hereafter sometimes *Brown*) and its progeny, such property may include the right to retirement benefits accrued by the employee spouse as deferred compensation for services rendered. (*Id.* at pp. 841-842.) This is the case whether or not the right to retirement benefits is "vested" in the sense of "surviv[ing] . . . discharge or voluntary termination," and whether or not it is "matured" in the sense of amounting to an "unconditional" entitlement "to ·immediate payment." (*Id.* at p. 842.) What is determinative is not any "abstract terminology" of this sort (*id.* at p. 851), but rather a single concrete fact—time. The right to retirement benefits "represent[s] a property interest; to the extent that such [a] right[] derive[s] from employment" during marriage before separation, it "comprise[s] a community asset . . . ." (*Id.* at p. 842.) "Throughout our decisions we have always recognized that the community owns all [such] rights attributable to employment during marriage" before separation. (*Id.* at p. 844.)

■ The right to retirement benefits is a right to "draw[] from [a] stream of income that . . . begins to flow" on retirement, as that stream is then defined. (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 383 [53 Cal.Rptr.2d 81, 916 P.2d 476]; see *In re Marriage of Gillmore* (1981) 29

Cal.3d 418, 428 [174 Cal.Rptr. 493, 629 P.2d 1]; *In re Marriage of Brown, supra,* 15 Cal.3d at p. 848.)[1]

The stream's volume at retirement may depend on various events or conditions after separation and even after dissolution. (See *In re Marriage of Gillmore, supra,* 29 Cal.3d at p. 428; *In re Marriage of Brown, supra,* 15 Cal.3d at p. 848.) Such events and conditions include both changes in the retirement-benefit formula (see *In re Marriage of Brown, supra,* 15 Cal.3d at p. 849, fn. 11; *In re Marriage of Gowan* (1997) 54 Cal.App.4th 80, 86 [62 Cal.Rptr.2d 453]; *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 767-768 [214 Cal.Rptr. 661]), and also changes in the basis on which the retirement-benefit formula operates (see *In re Marriage of Judd, supra,* 68 Cal.App.3d at p. 523; *In re Marriage of Adams, supra,* 64 Cal.App.3d at p. 186). Changes in the retirement-benefit formula may be frequent. (See, e.g., *University of San Francisco Faculty Assn.* v. *University of San Francisco* (1983) 142 Cal.App.3d 942, 950, fn. 2 [191 Cal.Rptr. 346] [changes in the retirement-benefit formula are provided for annually in a collective bargaining agreement].) Changes in the basis on which the retirement-benefit formula operates are virtually constant. (See, e.g., *In re Marriage of Adams, supra,* 64 Cal.App.3d at p. 186 [changes in the basis on which the retirement-benefit formula operates are effected continuously through "additional years of service," "increase in earnings," and "increase in age"].)

Thus, the stream's volume at retirement may turn out to be even less than feared, as when the right to retirement benefits fails to vest or mature (*In re Marriage of Brown, supra,* 15 Cal.3d at p. 848), or when the employment itself ceases because the employer ceases to do business. By contrast, it may turn out to be even more than hoped for, as when the employer increases the per-service-year multiplier of the retirement-benefit formula (see *In re Marriage of Bergman, supra,* 168 Cal.App.3d at pp. 767-768 [referring to "future

---

[1]Contrary to what appears to be the view of our dissenting colleagues, an employee spouse and a nonemployee spouse could not reasonably understand the right to retirement benefits other than as a right to draw from a stream of income that begins to flow on retirement, *as that stream is then defined.* In the typical case at least, the employee spouse is notified by the employer—and the nonemployee spouse must be deemed to be informed by the employee spouse—that, except as to what is vested, the employer reserves the right to amend or even terminate the underlying defined benefit retirement plan prior to the time of retirement. For example, in materials relating to PG&E's defined benefit retirement plan under the VRI program, it is stated: "Since future conditions affecting the company cannot be foreseen, the Board of Directors reserves the right to amend or terminate the plan[] at any time. Although any change in [the] plan or the termination of [the] plan will not affect the benefits paid to plan members before the date the plan was changed or ended, such change may result in reduced levels of benefits or benefit coverage, or increased retiree contributions, after the effective date of any such change. [¶] However, no amendment of a plan may deprive any person of a vested interest" therein.

liberalized pension rules or conditions"]; see also *In re Marriage of Gowan, supra*, 54 Cal.App.4th at p. 86 [recognizing the possibility of such liberalization]), or when the employee spouse lives to a greater than expected age, or serves more than expected years, or attains a higher than expected final compensation (*In re Marriage of Gillmore, supra*, 29 Cal.3d at p. 428, fn. 9).

That the nonemployee spouse might happen to enjoy an increase, or suffer a decrease, in retirement benefits because of postseparation or even postdissolution events or conditions is justified by the nature of the right to retirement benefits as a right to draw from a stream of income that begins to flow, and is defined, on retirement (see *In re Marriage of Cornejo, supra*, 13 Cal.4th at p. 383; *In re Marriage of Gillmore, supra*, 29 Cal.3d at p. 428; *In re Marriage of Brown, supra*, 15 Cal.3d at p. 848), with the nonemployee spouse, at one and the same time, holding the chance of more (see *In re Marriage of Anderson* (1976) 64 Cal.App.3d 36, 39 [134 Cal.Rptr. 252]; *In re Marriage of Adams, supra*, 64 Cal.App.3d at p. 186), and bearing the risk of less (*In re Marriage of Brown, supra*, 15 Cal.3d at p. 848), equally with the employee spouse. Because the nonemployee spouse is compelled to share the bad with the employee spouse (see *ibid.*), he or she must be allowed to share the good as well.

■ Hence, if the right to retirement benefits accrues, in some part, during marriage before separation, it is a community asset and is therefore owned by the community in which the nonemployee spouse as well as the employee spouse owns an interest. (*In re Marriage of Brown, supra*, 15 Cal.3d at pp. 841-842.)

The employee spouse is "free[] to change or terminate . . . employment, to agree to a modification of the terms of . . . employment (including retirement benefits), or to elect between alternative retirement programs"—in a word, he or she is "free[]" to "define . . . the nature of the retirement benefits owned by the community." (*In re Marriage of Brown, supra*, 15 Cal.3d at pp. 849-850.)

But regardless how the employee spouse might choose to exercise such freedom, the "nonemployee spouse owns an interest" in what he or she chooses by owning an interest in the community. (*In re Marriage of Gillmore, supra*, 29 Cal.3d at p. 425.)

It follows that a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits owns a community property interest in the latter's retirement benefits as enhanced. That is because, practically by definition, the right to retirement benefits that accrues, at least in part, during marriage before separation underlies any right

to an enhancement. (See Reddall, *The Characterization and Apportionment of Early Retirement Enhancements in Pre-Judgment Cases—Again* (Summer 1994) 17 Fam. L. News 22, 22-23 (hereafter Reddall).)[2]

The fact that a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits owns a community property interest in the latter's retirement benefits as enhanced does *not* mean that the enhancement is a community asset *in its entirety*. But the question what extent such an enhancement belongs to the community and separate estates is one of apportionment and not characterization.

## B

■ At the outset, both the *Gram* court and the *Frahm* court recognized that the issue of characterization of property, including the right to retirement benefits and retirement benefits themselves, as the community property of the employee spouse and the nonemployee spouse or the separate property of the employee spouse alone, does not turn on the motive of the employer. In any context, motive is, at best, hard to discern. (See, e.g., *Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 52, fn. 14 [65 Cal.Rptr.2d 366, 939 P.2d 766].) In this context, it is also "irrelevant." (*In re Marriage of Frahm, supra,* 45 Cal.App.4th at p. 543; see *In re Marriage of Gram, supra,* 25 Cal.App.4th at p. 862.) That is because the employer acts for its own business reasons, and not for reasons bearing on the characterization of property for employee spouses and nonemployee spouses. (*In re Marriage of Frahm, supra,* 45 Cal.App.4th at p. 543; *In re Marriage of Gram, supra,* 25 Cal.App.4th at p. 862.)

Beyond that point, however, the *Gram* court and the *Frahm* court diverged in their analytical approaches to resolve the issue of characterization.

In *Gram,* a nonemployee spouse owned a community property interest in an employee spouse's retirement benefits under a defined benefit retirement plan because the latter had accrued a right thereto during marriage before separation. (See *In re Marriage of Gram, supra,* 25 Cal.App.4th at p. 861.) Years after dissolution, in an attempt to avoid discharging certain employees, the employer offered incentives for early retirement, including an

---

[2]It is conceivable that, in a given case, a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits might not own a community property interest in the latter's retirement benefits as enhanced, as perhaps where the right to the enhancement is not derivative. (See *In re Marriage of Adams, supra,* 64 Cal.App.3d at p. 187, fn. 8 [stating in dictum that "we can envision an increase in benefits after separation that might be caused solely by the employee spouse's earnings"].) Such a case, however, seems the exception and not the rule. In any event, the issue is not presented, and hence need not be resolved today.

"Enhanced Early Retirement Option"—which was similar to PG&E's VRI program. (See *id.* at pp. 861, 866.) As the record therein reflects, the "Enhanced Early Retirement Option" involved, among other things, the crediting of five putative years of service and five putative years of age. (See also *id.* at p. 861.) The employee spouse elected to retire early under the "Enhanced Early Retirement Option." (*Id.* at p. 862.) By doing so, he received enhanced retirement benefits each month. (*Ibid.*) He did not receive any other benefits, such as a severance payment. The superior court characterized the enhancement as his separate property. (*Ibid.*)

The *Gram* court disagreed. After invoking a test derived from a series of decisions in the area of severance payments,[3] which looks to whether the benefit in question constitutes deferred compensation for services during marriage before separation or present compensation for loss of earnings thereafter, and after considering what it deemed to be "relevant factors" identified in those decisions (*In re Marriage of Gram, supra,* 25 Cal.App.4th at pp. 862-866), it held that the nonemployee spouse owned a community property interest in the employee spouse's retirement benefits as enhanced (*id.* at pp. 866-867): The "enhanced retirement benefit should have been included in the computation of" the nonemployee spouse's "community interest in the retirement payment" because "it was a part of, and intended to be, the realization of" the employee spouse's "retirement expectation and thus a form of deferred compensation for services rendered" (*ibid.*).

In *Frahm* too, a nonemployee spouse owned a community property interest in an employee spouse's retirement benefits under a defined benefit retirement plan because the latter had accrued a right thereto during marriage before separation. (See *In re Marriage of Frahm, supra,* 45 Cal.App.4th at pp. 537-538, 541-542, 545.) Years after dissolution, in an attempt to avoid discharging certain employees, the employer offered incentives for early retirement, including a "Voluntary Separation Incentive Program"—which was different from PG&E's VRI program. (See *id.* at pp. 541-542.) As the record therein reflects, the "Voluntary Separation Incentive Program" involved both a severance payment and also retirement benefits, which were available together either in a lump sum or by monthly installments. (See *ibid.*) The employee spouse elected to separate himself under the "Voluntary Separation Incentive Program." (*Id.* at p. 542.) By doing so, he received, in a lump sum as he had chosen, both a severance payment and also retirement

---

[3]See *In re Marriage of Skaden* (1977) 19 Cal.3d 679 [139 Cal.Rptr. 615, 566 P.2d 249]; *In re Marriage of Lawson* (1989) 208 Cal.App.3d 446 [256 Cal,Rptr. 283]; *In re Marriage of DeShurley* (1989) 207 Cal.App.3d 992 [255 Cal.Rptr. 150]; *In re Marriage of Horn* (1986) 181 Cal.App.3d 540 [226 Cal.Rptr. 666]; *In re Marriage of Kuzmiak* (1986) 176 Cal.App.3d 1152 [222 Cal.Rptr. 644]; *In re Marriage of Wright* (1983) 140 Cal.App.3d 342 [189 Cal.Rptr. 336]; and *In re Marriage of Flockhart* (1981) 119 Cal.App.3d 240 [173 Cal.Rptr. 818].

benefits. (*Id.* at pp. 537-538, 542, 544.)[4] As the record therein reflects, the employee spouse admitted that his retirement benefits were a community asset. (See also *id.* at pp. 537-538.) The superior court characterized the severance payment as his separate property. (*Id.* at pp. 538, 542.)

The *Frahm* court agreed. After reviewing *Gram* itself and the "severance payment" decisions on which it relied, it stated that it found little "guidance" therein. (*In re Marriage of Frahm, supra,* 45 Cal.App.4th at p. 543.)[5] "The cases said 'they were following one bright-line rule or another, but in fact they've simply looked at the menu of factors that point toward separate or community property, selected one or two, and then molded them into a result. The factor that carries the day in one case may not be determinative in the next. . . . About the only "bright line" in these cases is the differentiation between compensation for past services and compensation for future lost wages.' " (*Ibid.,* quoting Comment, 1994 Cal.Fam.L.Rep. 6298.) "Applying the reasoning of these cases to our facts works as well as trying to fit a square peg into a round hole. . . . [T]he results are inconsistent." (*In re Marriage of Frahm, supra,* 45 Cal.App.4th at p. 543.) At bottom, the "past services or future compensation test is inapt for determining the character of the benefit . . . ." (*Ibid.*) The *Frahm* court then turned back to *Brown,* from which it distilled a "simple" "message": "An employment benefit . . . is community property to the extent a right to it accrues during marriage" before separation. (*In re Marriage of Frahm, supra,* 45 Cal.App.4th at p. 544.) It held that the nonemployee spouse did not own a community property interest in the employee spouse's severance payment because the latter had not accrued a right thereto during marriage before separation. (*Id.* at pp. 544-545.)[6] It recognized that the *amount* of the severance payment that the employee spouse received was based, in part, on his years of service. (*In re Marriage of Frahm, supra,* 45 Cal.App.4th at pp. 544-545.) But it declared this fact "irrelevant" because his *right* to receive the severance payment was not based thereon. (*Id.* at p. 545 & fn. 2.) "The time rule determines the amount of the community share. It does not determine the character of the benefit. Stated another way, a court first looks to see if the right to the

<hr>

[4]Although there is certain language in *Frahm* that may be read to suggest that the "Voluntary Separation Incentive Program" involved both a severance payment and also *enhanced* retirement benefits (see *In re Marriage of Frahm, supra,* 45 Cal.App.3d at p. 542), the record therein shows that any such suggestion is incorrect.

[5]In a misstep, the *Frahm* court treated *Gram* as though it too dealt with a severance payment (*In re Marriage of Frahm, supra,* 45 Cal.App.3d at p. 540), instead of retirement benefits (*In re Marriage of Gram, supra,* 25 Cal.App.4th at pp. 861-862).

[6]The *Frahm* court asserted that the severance payment therein "resulted solely from" the employer's "beneficence." (*In re Marriage of Frahm, supra,* 45 Cal.App.4th at p. 544.) Whether or not that is true (cf. *In re Marriage of Brown, supra,* 15 Cal.3d at p. 845 [holding that retirement benefits " 'do not derive from the beneficence of the employer' "]) is of no consequence here.

payment accrued during marriage. If so, the time rule determines the extent of the community interest in the payment. But if the right to the payment did not derive from employment, it is separate property." (*Id.* at p. 545, fn. 2.)

On their respective facts, *Gram* and *Frahm* are each correct in its result as to characterization. *Gram* concludes that a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits owns a community property interest in the latter's retirement benefits as enhanced. For its part, *Frahm* concludes that a nonemployee spouse does not own a community property interest in an employee spouse's severance payment when the latter accrues a right thereto solely after separation.

Apart from their results, however, *Frahm* is sounder in its reasoning as to characterization because it cleaves closely to *Brown*, and *Gram* is weaker because it wanders away in the direction of ad hoc decisionmaking. As we held in *Brown*, what is determinative is the single concrete fact of time. To the extent—and only to the extent—that an employee spouse accrues a right to property during marriage before separation, the property in question is a community asset.

To recall what we made plain in *Brown*: The right to retirement benefits "represent[s] a property interest; to the extent that such [a] right[] derive[s] from employment" during marriage before separation, it "comprise[s] a community asset . . . ." (*In re Marriage of Brown, supra,* 15 Cal.3d at p. 842.) "Throughout our decisions we have always recognized that the community owns all [such] rights attributable to employment during marriage" before separation. (*Id.* at p. 844.)

And to recall what we made plain in *Brown* and its progeny: The right to retirement benefits represents a certain kind of property interest. It is a right to draw from a stream of income that begins to flow, and is defined, on retirement. (See *In re Marriage of Cornejo, supra,* 13 Cal.4th at p. 383; *In re Marriage of Gillmore, supra,* 29 Cal.3d at p. 428; *In re Marriage of Brown, supra,* 15 Cal.3d at p. 848.) Hence, it is a right to payments specified in accordance with a formula *as such payments may be specified in accordance with such formula as then obtains*—not to some "pre-retirement" payments specified in accordance with some "pre-retirement" formula. As stated, various events and conditions after separation and even after dissolution may affect the amount of retirement benefits that an employee spouse receives. But not their character. Once he or she has accrued a right to retirement benefits, at least in part, during marriage before separation, the retirement benefits themselves are stamped a community asset from then on.

In *Olivo* v. *Olivo* (1993) 82 N.Y.2d 202 [604 N.Y.S.2d 23, 624 N.E.2d 151] (hereafter sometimes *Olivo*), the New York Court of Appeals spoke

words that are pertinent here.[7] "By its very nature, a pension right . . . owned as" community property "is subject to modification by future actions of the employee. Should the employed spouse retire early, both parties receive a smaller benefit than they would have otherwise. The employee is, of course, free to do so, even though it incidentally and adversely affects the other party's rights, and the nonemployee spouse would have no grounds for recovery of the 'loss'. On the other hand, an employee who engages in extended employment at progressively higher wages is not entitled to keep the 'excess' earned beyond what would have accrued at the time of expected retirement." (*Olivo* v. *Olivo, supra*, 82 N.Y.2d at p. 209 [624 N.E.2d at p. 155]; see *In re Marriage of Gillmore, supra*, 29 Cal.3d at pp. 425, 428; *In re Marriage of Brown, supra*, 15 Cal.3d at pp. 849-850.) "Similarly, both parties' rights are generally subject to changes in the terms of a retirement plan, as well as to circumstances largely beyond their control, such as the salary level finally achieved by the employee and used to calculate the pension benefit. *What the nonemployee spouse possesses, in short, is the right to share in the pension as it is ultimately determined.* . . . [Any] enhancement" in the amount is a "modification of an asset not the creation of a new one." (*Olivo* v. *Olivo, supra*, 82 N.Y.2d at pp. 209-210 [624 N.E.2d at p. 155], italics added; see *In re Marriage of Gillmore, supra*, 29 Cal.3d at pp. 425-426; *In re Marriage of Brown, supra*, 15 Cal.3d at p. 849, fn. 11.)

### III

Turning to the proceeding at bar, we now consider the decision of the Court of Appeal sustaining the superior court's determination as to characterization that, by owning a community property interest in Husband's retirement benefits under PG&E's defined benefit retirement plan, Wife owns a community property interest in his retirement benefits as enhanced by the VRI program.

At the threshold, we believe that the Court of Appeal properly reviewed the superior court's determination as to characterization, as it apparently did, independently. Inasmuch as the basic "inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values," the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law. (*Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) As such, it is examined de novo. (*Ibid.*)

---

[7]Although the law of New York is that of equitable distribution and not community property, it has developed in accord with *Brown*. (See *Majauskas* v. *Majauskas* (1984) 61 N.Y.2d 481, 492, fn. 6 [474 N.Y.S.2d 699, 463 N.E.2d 15].)

On the merits, we also believe that the Court of Appeal properly concluded that the superior court's determination as to characterization was correct.

The superior court did not err insofar as it determined that Wife owns a community property interest in Husband's retirement benefits. That is undisputed and indisputable. Indeed, Husband admits the point.

Neither did the superior court err insofar as it determined that Wife owns a community property interest in Husband's retirement benefits as enhanced. As explained, a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits owns a community property interest in the latter's retirement benefits as enhanced. Husband's right to retirement benefits, which accrued, in part, during marriage before separation, underlies the right to the enhancement, which is derivative thereof. It bears emphasis that the enhancement is not a separate retirement benefit, still less a benefit separate from the retirement benefits themselves. It is the mere description that we apply to the result that we reach when we subtract the amount of retirement benefits that Husband would have received if he had waited to retire early at 55 years of age from the amount that he did in fact receive by electing to retire early at about 54⅓ years of age under the VRI program. It is no different from an enhancement effected through "additional years of service," "increase in earnings," or "increase in age"— which is uncontestedly a community asset (*In re Marriage of Adams*, *supra*, 64 Cal.App.3d at p. 186).

Husband argues against our conclusion as to characterization. He proves unpersuasive.

Husband asserts that Wife does not own a community property interest in his retirement benefits as enhanced. He concedes that, as a general matter, a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits owns a community property interest in the latter's retirement benefits as enhanced. He maintains, however, that a nonemployee spouse does not own a community property interest in the employee spouse's retirement benefits as enhanced through a postseparation "contract" between the employee spouse and the employer independent of any right to retirement benefits that accrued, in some part, during marriage before separation—whereby, for example, the employer gives the enhancement in consideration for immediate retirement, and the employee spouse immediately retires in consideration for the enhancement. Husband's retirement benefits, however, were *not* enhanced by a "contract" of this sort. Any such "contract" was derivative of the right to retirement benefits that

accrued, in some part, during marriage before separation. Contrary to his position—to quote *Olivo*—the "enhancement" is a "modification of an asset not the creation of a new one." (*Olivo* v. *Olivo, supra,* 82 N.Y.2d at p. 210 [624 N.E.2d at p. 155].) By its very terms, it results from "improvements to the retirement benefit formula" under PG&E's existing defined benefit retirement plan, not from a new plan altogether. Husband's premise, viz., that he accrued a right to the enhancement solely after separation, is unsupported.

Husband then asserts, more radically, that Wife does not own a community property interest in his retirement benefits as enhanced because the enhancement amounts to a severance payment and, as such, is his separate property. The enhancement here, however, was not a severance payment either in name or in nature. It called itself, and was in fact, an increase *in retirement benefits.* Distinguishable, accordingly, is *In re Marriage of Lawson, supra,* 208 Cal.App.3d 446. There, the court held that a nonemployee spouse did not own a community property interest in a severance payment given to an employee spouse after separation. (*Id.* at pp. 448-454.) But, unlike Husband and his retirement benefits, the employee spouse had not previously accrued any right to the payment whatsoever. (*Ibid.*) Distinguishable as well is *In re Marriage of Nelson* (1986) 177 Cal.App.3d 150 [222 Cal.Rptr. 790]. There, the court held that a nonemployee spouse did not own a community property interest in a stock option granted to an employee spouse after separation. (*Id.* at pp. 156-158.) Again, unlike Husband and his retirement benefits, the employee spouse had not previously accrued any right to the option whatsoever. (*Ibid.*)[8] At oral argument, Husband acknowledged that *what* the employer does is material and not *why.* It is of no consequence that PG&E enhanced his retirement benefits *because it wanted him to retire immediately.* Just as it would be of no consequence that he himself enhanced his retirement benefits, as by seeking and obtaining higher final compensation, *because he wanted to retire comfortably.* (See *In re Marriage of Gillmore, supra,* 29 Cal.3d at p. 428, fn. 9.) Rather, it is dispositive that PG&E *enhanced his retirement benefits*—in which Wife admittedly owns a community property interest.

■ Although neither Husband nor Wife claimed in the Court of Appeal, or claims here, that the superior court erred in its determination as to apportionment of Husband's retirement benefits as enhanced between community and separate property interests through its application of the time

---

[8]In *In re Marriage of Hug* (1984) 154 Cal.App.3d 780 [201 Cal.Rptr. 676, 46 A.L.R.4th 623], the court suggested in dictum that a nonemployee spouse might not own a community property interest in a stock option granted to an employee spouse after dissolution if the employee spouse—unlike Husband and his retirement benefits—had not accrued any right thereto during marriage before separation. (See *id.* at p. 793.) Noting, however, that the "issue [was] not before" it in that matter, it passed on. (*Ibid.*) So shall we.

rule, we shall address that question because their arguments about characterization may be deemed to reach apportionment by implication.

■ The superior court must apportion an employee spouse's retirement benefits between the community property interest of the employee spouse and the nonemployee spouse and any separate property interest of the employee spouse alone. (See, e.g., *In re Marriage of Adams, supra,* 64 Cal.App.3d at pp. 186-187; *In re Marriage of Bergman, supra,* 168 Cal.App.3d at pp. 748-751.) It has discretion in the choice of methods. (See, e.g., *In re Marriage of Adams, supra,* 64 Cal.App.3d at pp. 186-187; see also *In re Marriage of Henkle* (1987) 189 Cal.App.3d 97, 99 [234 Cal.Rptr. 351]; *In re Marriage of Poppe* (1979) 97 Cal.App.3d 1, 8 [158 Cal.Rptr. 500] (per Kaufman, J.).) Such methods include the time rule, which is apparently the one that is employed most frequently. (*In re Marriage of Henkle, supra,* 189 Cal.App.3d at p. 99; *In re Marriage of Poppe, supra,* 97 Cal.App.3d at p. 8.) Whatever the method that it may use, however, the superior court must arrive at a result that is "reasonable and fairly representative of the relative contributions of the community and separate estates." (*In re Marriage of Poppe, supra,* 97 Cal.App.3d at p. 11.)

■ Reviewing the matter, as we must, for abuse of discretion (see, e.g., *In re Marriage of Adams, supra,* 64 Cal.App.3d at p. 187), we believe that the superior court did not err in its apportionment of Husband's retirement benefits as enhanced between community and separate property interests through its application of the time rule. The *use* of the time rule is not unreasonable when the "amount of the retirement benefits is substantially related to the number of years of service." (*In re Marriage of Poppe, supra,* 97 Cal.App.3d at p. 8; accord, *In re Marriage of Judd, supra,* 68 Cal.App.3d at pp. 522-523.) That is the case here. The amount of Husband's retirement benefits as enhanced was the product of his final compensation, length of service, and a per-service-year multiplier. Moreover, the *result* of the time rule is not unreasonable when the "relative contributions of the community and separate estates" are accounted for. (*In re Marriage of Poppe, supra,* 97 Cal.App.3d at p. 11.) That is also the case here. Reflecting Husband's length of service of 17.39 years during marriage before separation and his length of service of 32.67 years in total, the community property interest in Husband's retirement benefits as enhanced was fixed at 53.23 percent and his separate property interest was fixed at 46.77 percent.

We find unsound *Gram*'s suggestion that, in applying the time rule to apportion an employee spouse's retirement benefits as enhanced between community and separate property interests, the superior court must add any putative years credited to the employee spouse's service to the denominator

of the time-rule fraction. (See Reddall, *supra*, 17 Fam. L. News at pp. 23-24 [criticizing the suggestion of *In re Marriage of Gram*, *supra*, 25 Cal.App.4th at p. 867].) Such years are *fictive*—they have no independent existence, but are merely a means by which the employer effects the enhancement. The employer can achieve exactly the same outcome, for example, by crediting a putative sum to the employee spouse's final compensation—in this proceeding, $492.23 to $5,360.43 per month, for a total of $5,852.66 per month. Or by increasing the per-service-year multiplier in the retirement-benefit formula that operates on the basis provided by the employee spouse—in this proceeding, from 1.6 percent to 1.74692 percent. Neither the community nor the employee spouse supplied the putative service credit as a mechanism of enhancement. The employer did. But both the community and the employee spouse supplied part of the basis on which the retirement-benefit formula operates, specifically, the years of service. And they both must share in what the putative service credit yields, because that credit amounts to a postseparation and even postdissolution event or condition on which the volume of the stream of income that constitutes retirement benefits depends. When, in a case such as this, the superior court uses the time rule, with the employee spouse's length of service during marriage before separation in the numerator, and with the employee spouse's length of service in total in the denominator, it arrives at a result that is "reasonable and fairly representative of the relative contributions of the community and separate estates." (*In re Marriage of Poppe*, *supra*, 97 Cal.App.3d at p. 11.) The superior court would disturb the balance if it were to add to the denominator any putative years credited to the employee spouse's service: the employee spouse did not supply this fiction. It would not restore the balance if it were to add such putative years to the numerator as well: even if the fact that the community did not supply this fiction is ignored, the value of a fraction, other than $\frac{1}{1}$, does not remain constant through the addition of the same number to both numerator and denominator. It must, accordingly, leave the balance as it finds it, without adding any putative years credited to the employee spouse's service to either the numerator or the denominator. To the extent that *Gram* is to the contrary, it is disapproved.

IV

For the reasons stated above, we conclude that we must affirm the judgment of the Court of Appeal.

It is so ordered.

George, C. J., Kennard, J., Werdegar, J., and Brown, J., concurred.

**BAXTER, J.**—I respectfully dissent. A marital community has a contractual entitlement to all benefits earned by a spouse during the marriage under

terms and conditions of employment *then in effect*. In my view, however, a dissolved community has no stake, by contract or otherwise, in any "enhancement" of benefits that was first offered *after the marital separation* and was *not in effect* during the marriage. This should particularly be the rule when the enhanced benefits are a new employer "subsidy" provided for the purpose of inducing a voluntary termination of employment, the future earnings and pension rights from which would themselves have been the employee spouse's separate property.

While this couple was married, the marital community, through the employed husband, contributed its services in return for a contractual right to compensation including (1) the husband's current salary during that period, and (2) the conditional future right to collect retirement pension benefits, insofar as attributable to work performed during the marriage, under the terms of the company retirement plan *as in effect when the work was performed*. That plan would apparently have allowed the husband to choose either "normal" retirement at age 65, or "early" retirement between ages 55 and 65 subject to a reduced monthly benefit payment. The monthly payment for "early" retirement would be lower for two reasons. First, by selecting early retirement, the husband would cease earning service credits and salary increases relevant to computation of a final pension. Second, he would sustain an actuarial adjustment in the monthly benefit, reflecting the longer life expectancy over which the pension earned would be paid.

Years after the marital community ceased to exist, at a time when the employee's salary and service credits were his alone, the employer, in an effort to eliminate positions, sought to induce his voluntary early retirement by offering him an increase in the reduced monthly pension benefits to which early retirement would otherwise entitle him. The increase was accomplished by granting years of putative future service credit and waiving the actuarial adjustment for early retirement.

*The erstwhile community performed not one minute of work under an employment contract that included these "enhanced" benefits, or in expectation thereof.* Instead, the community offered its services under the terms and conditions of compensation *then in effect*, and passed from existence with that understanding. The new benefits, announced long after dissolution of the marriage, sought to encourage and compensate the divorced husband's early withdrawal from his own employment, the future earnings and pension credits from which would have accrued solely to him.

Certainly the community, though long extinct, is entitled to share pro rata in the pension payments for which the husband became eligible at his

retirement *under the plan in effect during the mariage*. When contributing its time, effort, and skill to the husband's work during the marriage, the community contracted for, earned, and expected no less. (See, e.g., *In re Marriage of Brown* (1976) 15 Cal.3d 838, 844 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164] *(Brown)* ["community owns all pension rights attributable to employment during the marriage"].)

Yet the majority go further. They reason that once an employee "has accrued a right to retirement benefits, at least in part, during marriage before separation, the retirement benefits themselves are stamped a community asset from then on." (Maj. opn., *ante*, at p. 183.) Hence, they conclude, when a pension's terms *change* in the employee's favor *after* the marriage has ended, as a means of inducing the employee to forgo his own future work earnings and retire early, the ancient community retroactively gains a full proportionate share of the *enhancement*. The majority refuse even to concede the now-unmarried employee the full benefit of years of *future age and service credit* attributed to him under the "enhanced" voluntary retirement plan, though by actually working during the same future period, the husband would without doubt have accrued those same years of age and service for his sole account.

I cannot accept such a holding. The majority's result is at odds with the fundamental premise that community property is limited to that acquired during the marriage (Fam. Code, § 760), while assets earned or accumulated by the marital parties at any time after their separation are their separate property *(id.,* §§ 771, 772).

In support of their views, the majority advance two related premises. First, the majority imply, by contributing labor toward a spouse's pension, the community makes an "investment" in, and thus earns and acquires a pro rata "property" right to, the "stream of income" for which the employee will finally be eligible, as determined by all intervening events, both good and bad, that precede the employee's retirement. Second, the majority suggest, the community has earned an interest in any final pension, including postmarital "enhancements" thereof, insofar as it contributed eligibility credit toward the final pension. These theorems, in the extreme form the majority apply them, are supported neither by our prior decisions nor by sound logic.

Thus, prior to *Brown, supra,* 15 Cal.3d 838, California adhered to the rule that pension interests which had not *"vested"* (i.e., which remained subject to forfeiture through termination of employment) at the time of dissolution

remained a mere "expectancy," and were thus not a divisible item of community property. (E.g., *In re Marriage of Fithian* (1974) 10 Cal.3d 592, 596 [111 Cal.Rptr. 369, 517 P.2d 449]; *French* v. *French* (1941) 17 Cal.2d 775, 778 [112 P.2d 235, 134 A.L.R. 366].) Our seminal *Brown* decision abrogated this doctrine, concluding that accrued rights in a pension arising from the explicit terms and conditions of employment could constitute divisible community property even if such rights were not yet "vested" at the time of dissolution. Our opinion emphasized that the right to earn a pension is *contractual* in nature, a form of deferred compensation which "derive[s] from the *terms of the employment contract*." (*Brown, supra,* 15 Cal.3d 838, 845, italics added.)

We observed that the constitutional prohibition against impairment of contracts had been held to preclude a public employer from unilaterally withdrawing even nonvested pension rights which have already been earned by the employee's performance of work. (*Brown, supra,* 15 Cal.3d 838, 845-846.) A parallel rule had arisen in the private sector, we noted, such that an employer could not repudiate even nonvested pension rights "once the employee performed services *in reliance upon the promised pension*" (*id.,* at p. 846, italics added); instead, the employee "could enforce his right . . . either under *traditional contract principles* of *offer, acceptance and consideration* or under the doctrine of *promissory estoppel.* [Citation.]" (*Ibid.,* italics added.)

Thus, we reasoned, this interest is a chose in action rather than a mere "expectancy" or hope of future beneficence as to which no *enforceable right* exists. Insofar as the community contributed its time, labor, and effort toward the accumulation of such *contractual* rights, we concluded, it must share pro rata in their value. (*Brown, supra,* 15 Cal.3d 838, 844-847.)

"*Brown's* message is very simple. An employment benefit, whether or not vested, is community property to the extent a right to it *accrues during marriage.*" (*In re Marriage of Frahm* (1996) 45 Cal.App.4th 536, 544 [53 Cal.Rptr.2d 31] (*Frahm*), italics added.)

No such accrual occurred here. When the instant community performed its work, there was *no* contractual right or interest, "vested" or "nonvested,"

"mature" or "immature,"[1] *nor even a bare "expectancy,"* in the "enhanced" benefits over which the wife now seeks to assert a community interest. By performing its services, the community did not "accept" the employer's "offer" of "enhanced" pension terms, nor did the community contribute its labor in "reliance" on a "promise" of such terms. The employer acquired no legal or equitable obligation, by virtue of the community's efforts, to provide such "enhanced" benefits. They simply were not in the contemplation of the parties when the community effort was expended. Hence, nothing in the reasoning or holding of *Brown* supports the view that this community acquired rights in pension "enhancements" offered by the husband's employer only after the community had dissolved.[2]

Until today, no subsequent decision of this court had expanded *Brown's* holding to recognize a community interest in employment benefits first afforded after the community had dissolved. In *In re Marriage of Skaden* (1977) 19 Cal.3d 679 [139 Cal.Rptr. 615, 566 P.2d 249], we concluded, for reasons similar to those set forth in *Brown*, that the dissolved community had an interest in "severance payments," the rights to which were spelled out in the *initial employment contract* under which the community had contributed its labor. *In re Marriage of Stenquist* (1978) 21 Cal.3d 779 [148 Cal.Rptr. 9, 582 P.2d 96] held that an employee cannot entirely defeat an ex-spouse's community pension interest by electing a separate-property disability

[1]As *Brown* explained, in discussions of community property interests in pensions, a pension right is deemed "mature" when a present right to payment of benefits has arisen, as on eligibility for retirement. (*Brown, supra,* 15 Cal.3d 838, 842.)

[2]Taken out of context, *Brown's* assertions that pension rights "derive" from, or are "attributable to" employment, and that pension benefits are a form of "deferred compensation," may have contributed to subsequent misunderstanding in the Courts of Appeal about a former community's rights in employment benefits offered to or received by the employee after the marriage has ended. Since *Brown* was decided, a number of lower court decisions, addressing a wide range of situations, have assumed that employment-related benefits are community property to the extent they are "attributable" to prior community effort or appear intended as "deferred compensation" for past work rather than compensation for loss of future earnings, even though the payment or benefit was not part of the terms and conditions of employment when the community contributed its labor. (See, e.g., *In re Marriage of Gram* (1994) 25 Cal.App.4th 859, 862-867 [30 Cal.Rptr.2d 792] (*Gram*); *In re Marriage of Lawson* (1989) 208 Cal.App.3d 446, 452 [256 Cal.Rptr. 283]; *In re Marriage of Horn* (1986) 181 Cal.App.3d 540, 547-548 [226 Cal.Rptr. 666]; *Downer* v. *Bramet* (1984) 152 Cal.App.3d 837, 843 [199 Cal.Rptr. 830]; *In re Marriage of Wright* (1983) 140 Cal.App.3d 342, 344-345 [189 Cal.Rptr. 336]; *In re Marriage of Flockhart* (1981) 119 Cal.App.3d 240, 242-243 [173 Cal.Rptr. 818]; also cf. *In re Marriage of Gowan* (1997) 54 Cal.App.4th 80, 87-91 [62 Cal.Rptr.2d 453]; *In re Marriage of Melton* (1994) 28 Cal.App.4th 931, 938-939 [33 Cal.Rptr.2d 761].) However, as indicated above, *Brown* merely acknowledged the community's interest in enforceable *contractual* rights accrued by reason of the terms and conditions under which the community's employment *actually took place*. Neither *Brown* nor our subsequent cases (see text discussion, *post*) provide any basis for a conclusion that postmarital benefits are community property.

pension in lieu of a normal longevity pension for which the employee is also eligible. *In re Marriage of Gillmore* (1981) 29 Cal.3d 418 [174 Cal.Rptr. 493, 629 P.2d 1] (*Gillmore*) and *In re Marriage of Cornejo* (1996) 13 Cal.4th 381 [53 Cal.Rptr.2d 81, 916 P.2d 476] simply explained that if an ex-spouse has not previously been "cashed out" of his or her community property interest in the employee's pension, an employee who chooses to continue working after eligibility for retirement has occurred may nonetheless be required to start paying the ex-spouse the latter's pension share.[3]

Neither of the majority's reasons for now deeming postmarital pension "enhancements" to be community property is persuasive. The majority first advance the notion that even if "enhanced" pension benefits were first *offered* only after the marriage was dissolved, the community nonetheless earned and thus "acquired" rights thereto during the marriage insofar as community efforts account for a portion of the employment (including age and service credit eligibility requirements) which "underlies" the pension as a whole. The premise appears to be that when the community contributes, during any period, its time, effort, and skill to a particular employment, it then and there earns and acquires rights to a pro rata share of *any* pension the employee spouse ultimately receives, including amounts that stem from postmarital improvements to the pension plan.

For a simple reason, however, I cannot agree. As indicated above, a community provides its time, effort, and skill on the basis of the terms of compensation then in effect. Those terms include the conditional right to a future pension under the existing pension rules, but do not include new and

---

[3]In *Gillmore*, we observed that a nonemployee spouse who elects to "cash out" of the employee's pension at the time of dissolution thereby forfeits the right to share in the "increased [future] value" of the pension benefits. However, we made clear that any such "increased value" was that which " 'might accrue due to *increased age, longer service and a higher salary.*' " (*Gillmore, supra*, 29 Cal.3d 418, 428, fn. 9, quoting *In re Marriage of Luciano* (1980) 104 Cal.App.3d 956, 961 [164 Cal.Rptr. 93], italics added.) This passage does not imply that the nonemployee spouse, by deferring his or her pension share until the employee becomes eligible to retire, thereby acquires an interest in intervening *changes in the pension formula.*

In establishing the general principle that an employee cannot manipulate his pension rights to the *prejudice* of the former community, our decisions have suggested that the employee can agree to a postmarital "modification" of the pension terms so long as the former community's interest in the pension is not thereby *defeated* or *substantially impaired.* (E.g., *Gillmore, supra*, 29 Cal.3d 418, 425-426; *Brown, supra*, 15 Cal.3d 838, 849, & fn. 11.) But by placing limits on the employee's contractual right to *undermine* the pension already earned by the former community, we did not intimate that *more favorable* pension terms first offered to the employee after the marriage has ended must inure to the *benefit* of the former community, which did not supply its labor on those terms.

additional pension benefits conferred on the employed spouse only after the marriage has dissolved. While it existed and contributed its labor, the community earned and accrued no interest, expectancy, entitlement, or enforceable right in such changes.[4] By definition, such postmarital benefits cannot be "property . . . *acquired* by a married person *during the marriage*" (Fam. Code, § 760, italics added), and thus community property, but instead must constitute postseparation "earning[s]" or "accumulation[s]" that inure to the sole benefit of the employee (*id.*, §§ 771, 772). (*Frahm, supra,* 45 Cal.App.4th 536, 544; see *In re Marriage of Nelson* (1986) 177 Cal.App.3d 150, 156-157 [222 Cal.Rptr. 790] [stock options and bonus conferred only after separation are employee's separate property]; also cf. *In re Marriage of Walker* (1989) 216 Cal.App.3d 644, 651 [265 Cal.Rptr. 32] ["The community has an interest in employment benefits *conferred* during marriage."].)[5]

The majority insist their rule is necessary to treat the community fairly because, having borne the "risk" of intervening contingencies that might reduce or eliminate the ultimate pension amount, the community is entitled to the potential "reward" of beneficial contingencies, including postmarriage improvements to the plan. But this reasoning is flawed, because the "risks"

---

[4]Thus, it seems clear that if the wife in this case had elected at the time of dissolution to receive the present value of her pension rights as a lump sum, no value could have been assigned to the possibility of future beneficial changes in the terms of the pension plan. (See fn. 3, *ante.*)

[5]Even if I agreed that postmarital pension "enhancements" should inure to the former community's benefit insofar as the community contributed years of age and service bearing on the employee's entitlements, I would dispute the majority's application of that principle to the facts before us. Besides allowing retirement up to nine months before the usual minimum retirement age of fifty-five, the instant employer's "Voluntary Retirement Incentive" (VRI) plan "enhanced" the employee's pension in two ways: first, by adding three years of putative or "fictive" service credit, and second, by waiving the actuarial reduction for retirement at an early age. The majority accord the community a *full* pro rata share of both "enhancements" by direct application of the "time rule"; under their formula, the community's years of service credit are divided by the husband's total *actual* years of service credit to determine the community's percentage share of the total "enhanced" monthly pension amount. (Community years of service (17.39) divided by husband's actual total years of service (32.67) equals .5323 or 53.23 percent.) However, neither of the "enhancers" in the VRI plan operates or depends, by its terms, upon years of age or service credit previously contributed by the community. Instead, the "fictive" additional years of service credit serve as a *replacement* for credits the *husband*, but for the early retirement, would have earned *for his own account* in the *future*. (See *Gram, supra,* 25 Cal.App.4th 859, 867 [concluding that "fictive" years of service credit in postmarital early retirement plan must be added to husband's actual years of credit before "time rule" is applied].) The actuarial waiver also seems simply a means of redressing a disadvantage *caused by the early retirement itself,* and is the equivalent of adding "fictive" years of employee *age* which were *not* contributed by the community. (Cf. *Gram, supra,* at p. 861.) No persuasive reason appears why "enhancing" features of this kind should simply be allocated pro rata to the community.

the community faces are not commensurate with the "reward" the majority confers.

When a married employee performs labor and accrues rights under the terms of an existing plan to pay future pension benefits, the community faces, and can assess as it continues to work, the "risk" that the contingencies and conditions *set forth in the plan itself* will not come to pass in the most advantageous way. As the community works, it well understands *by reference to the plan already in existence* that the pension amount ultimately due, and the community's share thereof, may be eliminated or reduced insofar as the employee dies before retirement, retires early, changes jobs, is discharged from employment, or fails to attain the hoped-for level of final compensation. By the same token, the community should reap the "reward" when the pension rules *under which the community's labor was contributed* turn out to produce a favorable result.

But an *improvement* in the plan that occurs only after the marriage has ended is not the mere favorable resolution of a contingency or condition the community assumed when performing its services. Instead, such an enhancement is a new and unforeseeable development, one unrelated to the assumptions under which the community supplied its labor. Such a postmarital improvement constitutes no legitimate "reward" for the "risks" the community faced when earlier deciding whether to contribute its time, effort, and skill. Considerations of fairness do not suggest that the community, long interred, may rise from its ashes to claim a retroactive stake in such a benefit.[6] On the contrary, by retaining its rights under any and all pension terms in existence when community contributions were made, the community obtains the full benefit of its bargain.

---

[6]The majority imply that the community may indeed face the "risk" of disadvantageous changes in a pension plan which occur after dissolution of the marriage. But that "risk" is sharply limited by the principles of vested contractual rights. In essence, these provide that pension rights *already earned* cannot be eliminated or materially impaired, either by the employer unilaterally (see, e.g., *Betts* v. *Board of Administration* (1978) 21 Cal.3d 859, 863-864 [148 Cal.Rptr. 158, 582 P.2d 614]; *Brown, supra,* 15 Cal.3d 838, 846, & fn. 7; *Hunter* v. *Sparling* (1948) 87 Cal.App.2d 711, 725 [197 P.2d 807]), or by the employee's agreement (see fn. 3, *ante*). Indeed, while the instant employer reserved the right to amend the VRI plan as changing circumstances might require, it acknowledged in the VRI brochure that "no amendment of a plan may deprive a person of a vested interest in the Retirement Plan and Savings Fund Plan benefits."

The majority also propose that by supplying labor under the terms of a pension plan which expressly permits future modification of nonvested rights, as such plans typically do, a community thereby understands it is acquiring an interest in whatever increased "stream" of retirement income such future modifications may produce. (Maj. opn., *ante,* p. 178, fn. 1.) The premise is unpersuasive. By reserving the freedom to modify the pension's terms in the future, except as to vested rights, the employer merely warns that it can, and may, *reduce or eliminate* retirement benefits attributable to work *thereafter performed,* or as to which no

Even if there are circumstances in which a former community might properly participate in postmarital pension changes, this is not such a case. The "enhanced" benefits offered the husband in this case were not part of a companywide retroactive upgrade of the terms and conditions of employment. On the contrary, they were part of a limited program, targeted at a particular category of employees, and based upon specific personnel considerations applicable to that group at the time the program was announced. They were not intended as a reward for an employee's past work, nor did they reflect the true value of pension credits earned by the employee's actual service (including community service). On the contrary, they represented a new subsidy by the employer, offered for the sole purpose of inducing the targeted employees including husband, who was now unmarried and working for his sole account, to forgo future employment and the earnings associated therewith.

As the majority disclose, the program, announced in March 1993, was labeled a "Voluntary Retirement *Incentive*." (Italics added.) It was offered only to employees who, as of December 31, 1992, were 50 or older with at least 15 years of credited service, and who, as of February 17, 1993, worked in specified departments of the company. Those eligible were promised "valuable financial *incentives*" (italics added), "available *only* if you elect to retire through the program" (italics added), which would "make retirement an even more attractive option." The informational brochure described the program as a "management tool" to "reduc[e] costs" by "bring[ing] our workforce in line with the needs of our changing business." "This VRI," the brochure explained, "is developed to suit the needs of a particular situation[,] . . . is targeted to areas where reduction [in the workforce] is most needed[,] and strikes a balance between the stated objectives of cost reduction and fair treatment for our employees." As already recounted (see fn. 5, *ante*), the proffered "incentives" included, for the first time, the rights (1) to retire up to nine months *before* the usual minimum early retirement date, (2) to receive fictional years of service credit, and (3) to receive a monthly benefit calculated as though retirement was occurring at age sixty-five, the "normal" retirement age.

Manifestly, the increased monthly retirement benefit offered in return for participation in the VRI program was intended as consideration for the

---

contractual right has otherwise yet arisen. Such a warning does not give the community a right to share retroactively in *beneficial* pension changes that occur only after the community has dissolved. Moreover, the increased benefits at issue in this case did not stem from a routine pension "modification" the community might have anticipated at the time it contributed its time, effort, and skill. Instead, they arose from a later special arrangement between the employer and particular employees, outside the usual pension program, as a means to induce and compensate early retirements desired by the employer. (See discussion, *post*.)

employee's postmarital agreement to retire early, and as a partial replacement of the future compensation, both in monthly salary and in continuing accrual of pension rights, that the employee would thereby give up. Pension rights under the VRI option stemmed from a separate contract between the employee and the employer, offered and accepted after the marriage ended for reasons unrelated to the former community's efforts. This contract was intended to govern future, not past, relations between employer and employee. It was subsidized anew by the employer rather than reflecting the value of credits previously accumulated. Accordingly, it was independent of any community interest.[7]

In concluding otherwise, the majority merely restate the same unpersuasive theories discussed above. The dispositive point, the majority insist, is that the early retirement inducement was provided through the *pension*, a

---

[7]Even when incorporated into an existing pension plan, such an "enhancement" is necessarily a new "subsidy," just as a lump-sum "severance payment" would be, to the extent it exceeds the present value of pension credits accumulated and funded under the existing plan. We recently acknowledged this principle in another context. In *In re Marriage of Oddino* (1997) 16 Cal.4th 67 [65 Cal.Rptr.2d 566, 939 P.2d 1266] (*Oddino*), the husband's pension plan (Plan) allowed early retirement between ages 55 and 65, and also utilized the "Rule of 75," under which an eligible employee whose years of age and service credit totaled 75 or more could retire early without suffering a consequent actuarial reduction in monthly benefits. When the husband reached age 55, he was qualified for early retirement under the Rule of 75 but chose to continue working. The ex-wife sought to require the Plan to begin immediate payments of her pension share, calculated as though the husband had retired on his 55th birthday *under the Rule of 75*. The federal Employee Retirement Income Security Act of 1974 (ERISA) provides that a private pension plan need make direct payments to persons other than the covered employee only if directed to do so by a state court's "qualified domestic relations order" (QDRO). A QDRO may be used to enforce an ex-spouse's state-law right to immediate pension payments when the employee, though eligible to retire, has elected to postpone retirement. In such a case, however, payments under the QDRO must be calculated on the basis of the "present value of benefits actually accrued and *not taking into account . . . any employer subsidy for early retirement*." (29 U.S.C. § 1056(d)(3)(E)(i)(II), italics added.) We upheld the Plan's contention that when calculating payments to the ex-spouse under her QDRO, the Plan must *apply* the usual actuarial reduction for early retirement, because *waiver* of that reduction under the Rule of 75 is an early retirement "subsidy." (*Oddino, supra,* 16 Cal.4th at pp. 82-88.) Among other things, we noted that "employers not infrequently subsidize employees' early retirement as an incentive for specified groups of employees to leave the employer's work force voluntarily, so as to reduce its wage burden or 'avoid litigation that might result from laying off an employee.' [Citation.] Such subsidized early retirement programs are a *'quid pro quo between the plan sponsor and the participant.'* [Citation.]" (*Id.* at p. 88, italics added.)

The issues and policies under consideration in *Oddino* are not directly dispositive here. However, *Oddino*'s analysis supports the principle that pension amounts not actually earned by employment, but offered after the employee's marriage has ended as a subsidy for early retirement, are a matter between the employee and employer alone, and are not "attributable" to community effort so as to transmute them into community property. Indeed, the "fictive" service and age credits provided by the instant VRI plan closely resemble the "subsidized" pension enhancements at issue in *Oddino*.

form of benefit that "derive[s]" from past employment and depends in part on effort, years of chronological age, and service longevity contributed by the community. By earning rights in the pension itself, the majority conclude, the community thus also earned and acquired a right in *any terms* under which the pension was ultimately payable, even terms first offered after the marriage ended in order to induce the employee to retire early.

As I have already demonstrated, however, the majority's expansive notion of community pension rights does not comport with the contract and community property principles set forth in *Brown*. Moreover, for reasons the majority themselves suggest, the community or separate nature of a postmarital early retirement inducement should not depend on the precise means by which an employer has chosen to provide the inducement. The employer acts for its own business convenience, and is not primarily motivated by a concern for the community property consequences of its action. Here it is clear that by promising a new benefit to designated employees who agreed to retire early, the employer sought to encourage such early retirements and to provide the workers who chose that option at least partial compensation for their resulting loss of future earnings. That the employer elected to accomplish these goals through "enhanced" pension benefits, rather than some other means such as stock options or lump-sum severance payments, should not affect how the inducement is treated under the laws of community property.

Finally, the majority's holding will be a negative influence on the overall disposition of dissolution proceedings. Wherever possible, the parties to a marital dissolution should be encouraged to divide their property promptly and get on with their lives. (See, e.g., *Phillipson* v. *Board of Administration* (1970) 3 Cal.3d 32, 46 [89 Cal.Rptr. 61, 473 P.2d 765].) However, the rule announced today will weigh against a nonemployee spouse's decision to "cash out" of the employee's pension at the time of dissolution. If, and only if, division of the pension is left open until the employee retires—often years after the marriage has ended—the ex-spouse may gain a share of favorable pension terms later offered to the employee as an inducement to retire early. There appears no persuasive ground to impose this further incentive for delay in the final division of marital property.

For all these reasons, I conclude that the instant community is entitled to share pro rata, by application of the "time rule," in the $2,350.39 monthly benefit the husband would receive for early retirement at age 55 under the previously existing pension plan, but has no interest in the additional $708.91 monthly amount attributable to the VRI "enhancement." I would

therefore reverse the judgment of the Court of Appeal. I would remand the cause to that court with directions to order further trial court proceedings consistent with the views expressed in this opinion.

Chin, J., concurred.