[No. A090032. First Dist., Div. Three. Oct. 30, 2001.]

In re the Marriage of IRENE CONLIN and LOUIS CLAUDE DRAPEAU.
IRENE CONLIN DRAPEAU, Appellant, v.
LOUIS CLAUDE DRAPEAU, Respondent.

**COUNSEL**

Law Offices of Lawrence W. Thorpe, Lawrence W. Thorpe, Stefan A. Spielman, Trevor C. Thorpe; Law Office of Barbara DiFranza, Barbara DiFranza; and Garrett C. Dailey for Appellant.

DeGoff and Sherman, Richard Sherman, Victoria J. DeGoff; Law Office of Nordin F. Blacker, Nordin F. Blacker and Gregory Maple for Respondent.

**OPINION**

**CORRIGAN, J.**—Irene Conlin Drapeau appeals from the trial court's ruling that Louis Claude Drapeau's "Early Retirement Benefit" (ERB) was his separate property.[1] She contends the ERB was derived from a contractual right acquired during the parties' marriage, and must therefore be characterized as community property. We agree, and reverse and remand on that issue. Jennifer also contends the trial court abused its discretion (1) in failing to order sufficient spousal support to allow her to save at the same rate as during the parties' marriage, and (2) in setting a prospective termination date to coincide with Louis's mandatory retirement. We remand the spousal support order to permit the trial court to consider the parties' marital savings history as an element in their marital standard of living, as explained below.

*Factual and Procedural Background*

Louis and Jennifer were married in 1976, and separated in 1997. Both were 55 years old at the time of trial. Their minor child was 15 years old; their 18-year-old son also lived at home. Jennifer, who had not worked outside the home during most of the marriage, was employed at the time of trial as chief of staff to the Mayor of Berkeley, earning a salary of $50,000.

Louis began working for Arthur Andersen and Company (AA) in 1971. By the time of trial, he was a senior partner, earning approximately $1

---

[1] For clarity, we refer to the parties hereafter by their first names. Following the lead of the parties, we refer to Irene Conlin Drapeau as Jennifer.

million in 1998. The AA partnership agreement requires partners to retire when they reach the age of 62. AA provides three separate benefits for its partners at the conclusion of their employment. The first benefit is a Keogh plan. Louis's Keogh plan, worth approximately $1.6 million, was divided between the parties by agreement. The second benefit is the basic retirement benefit (BRB), a relatively modest fixed benefit ($38,800 per year at the time of trial), which the parties agreed to divide equally when paid.

The third benefit is the contested ERB, which is available to "units" partners who have 10 years of partner service and retire between the ages of 56 and 62.[2] The ERB is calculated based on the partner's units earned and per unit earnings, resulting in an amount approximately equal to two times the partner's average annual salary during his last three years of employment.[3] It is payable either in a lump sum or over a period of up to 10 years. The total value of the ERB declines each month after the partner's 56th birthday, reaching a value of zero at the partner's 62d birthday, when the other AA retirement benefits become available. Following trial, the court ruled that the ERB was Louis's separate property akin to a severance benefit, and awarded Jennifer $12,500 in monthly spousal support.[4] In response to Jennifer's request, the court issued a detailed statement of decision after a further hearing. Jennifer filed a timely notice of appeal.

*Discussion*

## A. Early Retirement Benefit

Louis concedes that the most pertinent Supreme Court authority concerning the proper characterization of early retirement payments such as the ERB is *In re Marriage of Lehman* (1998) 18 Cal.4th 169 [74 Cal.Rptr.2d 825, 955 P.2d 451] (*Lehman*). In that case, the court held that a nonemployee spouse had a community property interest in the employee spouse's enhanced retirement benefit, even though the enhancement was offered after the parties' separation, because the underlying retirement benefit derived, in part, from employment during the marriage.[5] (*Id.* at pp. 179-180.) The Supreme Court observed that the right to retirement benefits accrued by the

---

[2]Louis was a "units" partner, and had satisfied the 10 years of service requirement before the parties separated.

[3]If a units partner dies before his 56th birthday or is thereafter terminated from his position, he receives a benefit equal to his ERB.

[4]The parties had also agreed Louis would pay monthly child support of $4,200 for the parties' minor child, until he graduated from high school or reached the age of 19.

[5]In *Lehman,* many years after the dissolution of the parties' marriage, the employer had offered a "Voluntary Retirement Incentive" program under which an eligible employee who retired early would receive additional service credit, and did not suffer the normal actuarial

employee spouse " 'represent[s] a property interest; to the extent that such [a] right[] derive[s] from employment' during marriage before separation, it 'comprise[s] a community asset . . . .' " (*Id.* at p. 177, quoting *In re Marriage of Brown* (1976) 15 Cal.3d 838, 842 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164] (*Brown*).) The court also recognized that the employee spouse's postseparation actions may affect the nature of the retirement benefits owned by the community, but held that the nonemployee spouse owns an interest in the asset. (*Lehman, supra,* at p. 179.)

In analyzing the applicable law, the *Lehman* court reviewed in some detail two appellate cases which dealt with the characterization of retirement benefits: *In re Marriage of Gram* (1994) 25 Cal.App.4th 859 [30 Cal.Rptr.2d 792] (*Gram*) and *In re Marriage of Frahm* (1996) 45 Cal.App.4th 536 [53 Cal.Rptr.2d 31] (*Frahm*). Both cases had properly recognized that "the issue of characterization of property . . . does not turn on the motive of the employer. In any context, motive is, at best, hard to discern. [Citation.] In this context, it is also 'irrelevant.' [Citations.] That is because the employer acts for its own business reasons, and not for reasons bearing on the characterization of property for employee spouses and nonemployee spouses. [Citations.]" (*Lehman, supra,* 18 Cal.4th at p. 180.) In other respects, however, *Gram* and *Frahm* differed in their analytical approaches.

In *Gram*, years after the dissolution of the parties' marriage, the employer offered early retirement incentives, including the crediting of additional years of service and age, in an attempt to avoid discharging certain employees. The employee spouse elected to retire early, and received enhanced retirement benefits each month. (*Gram, supra,* 25 Cal.App.4th at pp. 861-862.) The superior court characterized the enhancement as the employee spouse's separate property, but the appellate court disagreed. (*Id.* at pp. 862, 866-867.) It applied a test derived from cases involving severance payments, "which looks to whether the benefit in question constitutes deferred compensation for services during marriage before separation or present compensation for loss of earnings thereafter, and . . . held that the nonemployee spouse owned a community property interest in the employee spouse's retirement benefits as enhanced . . . because 'it was a part of, and intended to be, the realization of' the employee spouse's 'retirement expectation and thus a form of deferred compensation for services rendered' [citation]." (*Lehman, supra,* 18 Cal.4th at p. 181.)

In *Frahm,* the employer offered a different incentive for early retirement, which included both a severance payment and retirement benefits. (*Lehman,*

reduction of benefits for early retirement. (*Lehman, supra,* 18 Cal.4th at p. 175.) The Supreme Court noted that the necessity of apportioning the community interest in the enhancement did not affect its characterization. (*Id.* at p. 180.)

*supra,* 18 Cal.4th at p. 181.) The employee spouse admitted the retirement benefits were a community asset, but contended the severance payment was his separate property. The appellate court agreed, relying on what it characterized as the "very simple" message of the Supreme Court's decision in *Brown, supra,* 15 Cal.3d 838, that "[a]n employment benefit, whether or not vested, is community property to the extent a right to it accrues during marriage." (*Frahm, supra,* 45 Cal.App.4th at p. 544.) The *Frahm* court concluded the employee spouse had not accrued a right to the severance payment during marriage, and the nonemployee spouse therefore had no community property in the severance payment.[6] (*Frahm,* at p. 544.)

The *Frahm* court found little guidance in *Gram* and the severance payment decisions on which *Gram* had relied, noting that the results were inconsistent, and concluding that "[a]pplying the reasoning of these cases to our facts works as well as trying to fit a square peg into a round hole." (*Frahm, supra,* 45 Cal.App.4th at p. 543.) The *Frahm* court also rejected "[t]he past services or future compensation test" as "inapt for determining the character of the benefit," noting that it focused on the wrong question, the motivation of the employer. (*Ibid.*)

In *Lehman,* the Supreme Court concluded that both *Gram* and *Frahm* were correct in their results, but that "*Frahm* is sounder in its reasoning as to characterization because it cleaves closely to *Brown,* and *Gram* is weaker because it wanders away in the direction of ad hoc decisionmaking. As we held in *Brown,* what is determinative is the single concrete fact of time. To the extent—and only to the extent—that an employee spouse accrues a right to property during marriage before separation, the property in question is a community asset." (*Lehman, supra,* 18 Cal.4th at p. 183.)

As has been observed: "While the disputed asset in *Lehman* was an 'enhanced retirement benefit,' the Court distinguished the results in several other types of employee benefit cases (involving severance payments and stock options) solely on the basis of *when the right to the benefit accrued.* [Citation.] [¶] In so doing, the Court seems to have sent a strong message that the *Brown* 'time' approach (focusing on whether the *right to the benefit accrued during marriage and before separation*) should apply to the characterization of any type of employment termination benefit—whether derivative of retirement benefits or an entirely separate payment. The pre-*Lehman* line of cases [distinguishing between past services and future compensation] may have reached a correct result, but the continuing validity of the *approach* they took to get at that result is now open to question." (Hogoboom

---

[6]The fact that the calculation of the amount of the severance payment was somewhat dependent on the length of employment did not affect the character of the benefit. (*Frahm, supra,* 45 Cal.App.4th at pp. 544-545; see also *Lehman, supra,* 18 Cal.4th at pp. 182-183.)

& King, Cal. Practice Guide: Family Law (The Rutter Group 2001) ¶ 8:198.8, p. 8-50.4.)

■ Here the ERB was considered Louis's separate property because it provided present compensation for lost future earnings, rather than deferred compensation for past services rendered during the marriage. That analytical approach, however, which also underlies respondents' argument on appeal, was disapproved by the Supreme Court in *Lehman*. Instead, the relevant question is whether the right to the ERB accrued during marriage before separation; if so, it is a community asset. (*Lehman, supra*, 18 Cal.4th at p. 184.)

The record here indicates that the ERB was payable pursuant to a contract entered into during the parties' marriage. (See *In re Marriage of Skaden* (1977) 19 Cal.3d 679, 687-688 [139 Cal.Rptr. 615, 566 P.2d 249] (*Skaden*); *In re Marriage of Horn* (1986) 181 Cal.App.3d 540, 547-548 [226 Cal.Rptr. 666].) Furthermore, all 10 years of qualifying employment also took place before the parties' separation. Thus the ERB was derived from a contractual right acquired during the parties' marriage, and must be characterized as community property. (See *Lehman, supra*, 18 Cal.4th at pp. 182-183.)

Other aspects of the ERB itself also support its characterization as a community asset. First, its designation as an "Early Retirement Benefit" strongly suggests its character as an element in the employee's planning for retirement.[7] In addition, the parties' personal financial statements, prepared before separation, confirm that they viewed the ERB in such a manner, and that it was an important part of their financial planning for retirement. (See *Gram, supra*, 25 Cal.App.4th at p. 866 [enhanced early retirement plan constituted part of "the realization of [the employee's] retirement expectation].") The substantial financial value of the ERB is a further indication of its significant role in the context of the AA retirement program as a whole.[8]

All these aspects of the ERB are in contrast to the nature of the severance payments held to be separate property in the cases on which Louis relies. (See, e.g., *In re Marriage of Lawson* (1989) 208 Cal.App.3d 446 [256

---

[7]We note in this regard that a "Voluntary Retirement Incentive" and an "Enhanced Early Retirement Option" have both been held to constitute community property. (*Lehman, supra*, 18 Cal.4th at pp. 175, 185; *Gram, supra*, 25 Cal.App.4th at pp. 861, 866-867.) A "Voluntary Separation Incentive Program," on the other hand, has been characterized as severance pay and therefore separate property. (*Frahm, supra*, 45 Cal.App.4th at pp. 541-542.)

[8]Indeed, the trial court noted during argument below that "the retirement plan that kicks in [at age 62] is so small, by comparison." The court also found that Louis, who was not yet 56 at the time of trial, was the oldest of the approximately 100 partners in AA's San Francisco office.

Cal.Rptr. 283]; *In re Marriage of DeShurley* (1989) 207 Cal.App.3d 992 [255 Cal.Rptr. 150].) In those cases, the payments received by the employee spouse resulted from unexpected and ad hoc postseparation incentives offered by an employer attempting to reduce its workforce in response to changing business conditions, not from long-anticipated retirement benefits to which the employee spouse was contractually entitled by virtue of his employment during the marriage. The ERB was not a new benefit created after the parties' separation, but constituted a significant part of Louis's compensation package, which was earned with marital labor.[9] It "was not a severance payment either in name or in nature." (See *Lehman, supra*, 18 Cal.4th at pp. 185-186.)[10] Jennifer was therefore entitled to her share of the community's proportionate interest in the ERB and we reverse and remand on this issue.

While Louis contends that payments made after separation pursuant to a contract signed during marriage do not necessarily constitute community property, the cases on which he relies preceded *Lehman*, and are also otherwise distinguishable. In *Garfein v. Garfein* (1971) 16 Cal.App.3d 155 [93 Cal.Rptr. 714], the employee spouse was an actress who signed a multiyear contract under which a motion picture studio agreed to pay her a fixed amount regardless of whether she appeared in any of their movies. She agreed, however, not to accept other potentially conflicting engagements during that time. (*Id.* at pp. 158-159.) Because her postseparation conduct was essential to her right to earn compensation under the contract, the court concluded the payments were earned after separation and constituted the employee spouse's separate property. (*Id.* at p. 159.) Here, however, Louis's right to receive the ERB was based on his 10 years of qualifying employment during the marriage and before separation. *In re Marriage of Roesch* (1978) 83 Cal.App.3d 96 [147 Cal.Rptr. 586] is also distinguishable. Although the contract in that case was signed during the marriage, the employment began only after the parties separated. (*Id.* at p. 105.)

Louis also argues that the ERB cannot be viewed as compensation for past services because the amount of the benefit declines the longer the employee

---

[9] It is not significant for these purposes whether the ERB was covered by ERISA (Employee Retirement Income Security Act) (29 U.S.C. § 1001 et seq.), was funded by AA, was technically discretionary, could be paid to a surviving heir, or could be forfeited under certain circumstances if the employee accepted conflicting employment. (See *Skaden, supra*, 19 Cal.3d at pp. 686-687.) Many of these characteristics were also apparently shared by the BRB, a retirement benefit for which an AA employee is eligible at age 62, and which the parties here agreed to divide as community property.

[10] The *Lehman* court also concluded that it was "of no consequence that [the employer] enhanced [the employed spouse's] retirement benefits because it wanted him to retire immediately." (*Lehman, supra*, 18 Cal.4th at p. 186, italics omitted.)

works after reaching age 56, and disappears entirely when the employee reaches the age of 62. This argument misses the point: the ERB was earned by Louis's marital labor, and is therefore a community asset.[11] The declining value of the benefit could also be seen as further proof of its status as a retirement benefit, providing a bridge to the other retirement benefits available at the age of mandatory retirement. Louis also points out that he will not be entitled to an ERB unless he stops working for AA; the same is true, however, of any retirement benefit.[12] Nor is it determinative that the retirement benefit at issue in *Lehman* was an enhancement of the employer's regular retirement benefits, rather than a separate retirement benefit. Whether or not the ERB is independent of other retirement benefits offered by AA, under the analytical approach mandated in *Lehman*, it is the time of the benefit's accrual that is crucial.[13] The formula which generates the ERB benefit depends on the employee's number of partnership units; Jennifer concedes that units earned after the date of separation are Louis's separate property. We therefore remand for the superior court to apportion the ERB accordingly. (See *Lehman, supra,* 18 Cal.4th at p. 187.)

## B. *Spousal Support*

Family Code section 4320 lists a number of circumstances to be considered by the trial court in awarding spousal support.[14] These include "[t]he needs of each party based on the standard of living established during the marriage." (§ 4320, subd. (d).) Case law has described the marital standard of living (MSL) as "reasonable needs commensurate with the parties' general station in life. [Citation.]" (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 491 [274 Cal.Rptr. 911].) ▮ In evaluating the relevant statutory factors to determine permanent spousal support, "the actual marital standard of living" is not "an absolute measure of reasonable need, but merely a 'basis' or reference point for determining need and support." (*Id.* at

---

[11]We also note that the value of the ERB payable in any given case is based on the number of partnership units previously earned by the retiring employee.

[12]The Supreme Court has also held that "[a] unilateral choice to postpone retirement cannot be manipulated so as to impair a spouse's interest in those retirement benefits." (*In re Marriage of Gillmore* (1981) 29 Cal.3d 418, 423 [174 Cal.Rptr. 493, 629 P.2d 1].) Thus if the employee continues to work when eligible to retire, the nonemployee spouse is entitled to compensation. (*Id.* at pp. 425-427.)

[13]The Supreme Court observed in a footnote in *Lehman* that a case might conceivably arise in which a nonemployee spouse would not have a community property interest in the employee's enhanced retirement benefits, as when the increase in benefits after separation was caused solely by the employee spouse's earnings. (*Lehman, supra,* 18 Cal.4th at p. 180, fn. 2.) This exception is not applicable here, as all the years of employment required for Louis to qualify for the ERB took place during the marriage, and the vast majority of his partnership units were also earned during the marriage.

[14]All further statutory references are to the Family Code.

p. 484.) While the trial court must consider the statutory guidelines, the ultimate decision rests within its broad discretion. "The purposes of spousal support inevitably vary from case to case, depending upon the parties and the facts and circumstances of the case." (*Id.* at p. 480.) "Weighing the factors specified [by statute] and by appellate case law, the trial court, in exercising its discretion on the issue of spousal support, must endeavor to make an order which will achieve a 'just and reasonable' result in each case." (*Id.* at p. 482.) " 'Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders.' [Citation.]" (*In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 93 [91 Cal.Rptr.2d 374].)

■ Jennifer's main argument is that the parties' history of consistently saving significant portions of their income constituted an important part of their MSL, and the spousal support order should therefore have provided an amount sufficient to enable her to continue to save as she did during the marriage, given Louis's ability to pay.[15] We agree that a rule prohibiting consideration of the parties' marital savings history would penalize those who are prudent enough to save during marriage, and would conflict with sound public policy to encourage such savings.

While Jennifer concedes that she has received the benefit of her community share in the parties' past savings, she points out that the goal of their ongoing savings plan was to enable them to retire early while continuing their present standard of living, a goal which Louis can continue to pursue under the existing spousal support order, but she cannot. In *In re Marriage of Winter* (1992) 7 Cal.App.4th 1926, 1931 [10 Cal.Rptr.2d 225], the husband argued that an award of temporary spousal support should be reduced from the guideline amount because the parties had a frugal lifestyle during marriage. The trial court concluded that the parties' practice of investing a portion of their income was " 'part of the standard of living' " that should be included in a temporary support order. (*Ibid.*) Division Four of this court noted that the parties in *Winter* had allocated "substantial funds for saving and investment" concluding that "we fail to see why Wife should be deprived of her accustomed life-style just because it involved the purchase of stocks and bonds rather than fur coats." (*Id.* at pp. 1932-1933.) We recognize that temporary support is designed to maintain the parties' positions pending trial, while the need for permanent spousal support is determined by their financial circumstances after dissolution and division of their

---

[15]During the last three years of the marriage, the parties' savings averaged $15,000 a month. During the last year of the marriage, when Louis's income was significantly higher, they saved approximately $22,000 per month. Jennifer contends she was entitled to continue saving at a rate of $7,887 per month to maintain the marital standard, in addition to $12,206 in monthly expenses.

property. Based on the application of the relevant statutory criteria, however, there is no policy reason to foreclose consideration of savings as an aspect of MSL. The *Winter* court's underlying reasoning appears equally applicable to the setting of permanent spousal support, particularly where ability to pay is not a limiting factor.

Louis asserts that savings should not be considered in setting permanent spousal support, because neither section 4320 nor the Judicial Council "Income and Expense Declaration" form specifically mentions savings as a relevant factor. This argument is overly simplistic, however. The court, by statute, must consider each party's needs "based on the standard of living established during the marriage" (*id.*, subd. (d)), and the Judicial Council form in question includes a provision for "other" expenses, as specified.[16]

In considering the applicability of actual expenditures to the definition of MSL, case law has indicated that "if the supporting spouse has the ability to pay, support should be ordered at a level sufficient to allow the supported spouse to maintain the [MSL]." (*In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 565 [5 Cal.Rptr.2d 558] (*Weinstein*).) Louis asserts that savings is not an expense, and should not be considered in evaluating MSL or setting spousal support. Savings, however, may also be considered a form of deferred expenditure or planned future consumption.[17] As counsel suggested at oral argument, it becomes difficult to make a principled distinction in this regard between a check written to an IRA (individual retirement account) and a mortgage payment, particularly when the parties have a history of making extra payments on their mortgage. Moreover, as Division Two of this court observed in *Weinstein*, "we are aware of no rule requiring that standard of living be defined by actual expenditures in all cases."[18] (*Id.*, at p. 565.)

Louis and Jennifer had a history of significant marital savings, designed to ensure financial security and comfortable provision for their approaching retirement. Public policy encourages such savings, which benefit both the

---

[16]Furthermore, in addition to other specified factors relating to spousal support, section 4320 also requires the court to consider "[a]ny other factors the court determines are just and equitable." (*Id.*, subd. (*l*).)

[17]Jennifer asserts in her reply brief that "[b]y saving, they were purchasing an expectation of comfortable retirement."

[18]In *Weinstein*, the court held that the trial court had not abused its discretion in basing the award of spousal support on the parties' marital income, rather than their expenditures, which had sometimes been beyond their means. (*Weinstein, supra*, 4 Cal.App.4th at p. 566.)

individuals concerned, and society as a whole.[19] (See *In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 11-12 [17 Cal.Rptr.2d 480].) We realize that not everyone's resources permit such savings, and that in many cases the parties' financial circumstances after dissolution may require that the standard of living enjoyed during the marriage be curtailed. Under the circumstances here, however, where Louis's ability to pay a reasonable level of support was not a limiting factor, the trial court should have considered the parties' practice of savings as an element in their MSL. Because it is not clear from the record whether the trial court considered the marital history of savings as an element of the parties' MSL, we remand to permit it to do so.[20]

■ Jennifer also contends the trial court abused its discretion in providing that spousal support would cease on Louis's 62d birthday, the mandatory retirement age at AA, while allowing Jennifer "three months from that date to file a motion seeking spousal support under the financial circumstances that exist at that time." Section 4320, subdivision (k) requires the trial court to consider as one factor in ordering spousal support "[t]he goal that the supported party shall be self-supporting within a reasonable period of time." While "[a] trial court should not terminate jurisdiction to extend a future support order after a lengthy marriage, unless the record clearly indicates that the supported spouse will be able to adequately meet his or her financial needs at the time selected" (*In re Marriage of Morrison* (1978) 20 Cal.3d 437, 453 [143 Cal.Rptr. 139, 573 P.2d 41]), the trial court's order here does not terminate jurisdiction at the same time as spousal support, but allows for further evaluation of the circumstances existing at that time, on Jennifer's motion. Jennifer also contends the presumptive termination of her spousal support was based on speculation rather than reasonable inferences drawn from the evidence. The trial court found, however, that "[g]iven their respective retirement plans and assets, and increases in value that can be reasonably expected to such plans and assets between now and age 62, each party should be able to live on his or her own, at the marital standard of living, without assistance from the other." The trial court did not abuse its discretion in so concluding, and in allowing Jennifer to move for additional spousal support at that time, if necessary. The court's statement of decision

[19]We also note that in discussing the case of *In re Marriage of Kennedy* (1987) 193 Cal.App.3d 1633 [239 Cal.Rptr. 151], which held that a supported spouse was not required to invest for income rather than growth, Louis concedes that "[i]t is reasonable to allow a former spouse to set aside some of her share of the community property for retirement purposes, rather than requiring her to invest it all to generate income so the other spouse will have to pay less support."

[20]We do not hold that in any case, including this one, the supported spouse is necessarily entitled to save at any particular rate, but merely that the marital savings history should be considered as an element in determining MSL. We also reject Louis's argument that including a savings component would impermissibly extend the duration of the support order beyond a reasonable time or constitute an inappropriate form of life insurance.

was sufficiently detailed in terms of both factual and legal conclusions to permit meaningful appellate review. Evidentiary detail is not required. (*In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 686-687 [226 Cal.Rptr. 485].)

## Disposition

The trial court's ruling regarding the characterization of the ERB is reversed. On remand, the trial court shall determine Jennifer's community share therein and reserve jurisdiction over the issue of the ERB until Louis leaves his employment. The spousal support order is reversed and remanded to permit the trial court to consider the parties' marital savings history as an element in their marital standard of living.

McGuiness, P. J., and Parrilli, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 13, 2002. Kennard, J., was of the opinion that the petition should be granted.