Filed 8/28/23  Marriage of Yang CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of JACK and JACQUELINE YANG. | |
| JACK C. YANG, | D079890 |
| Respondent, | |
| v. | (Super. Ct. No. D564588) |
| MINH-THU HUYNH, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge.  Affirmed.

The Appellate Law Firm, Aaron Myers and Mark Kuntze for Appellant.

Higgs Fletcher & Mack, John Morris and Steven M. Brunolli for Respondent.

Jack C. Yang filed a petition in 2016 seeking to divorce his wife of 24 years, Minh-Thu Huynh (Jacqueline).[1] Proceedings were bifurcated, with the court dissolving the marriage in 2018 and reserving jurisdiction to divide the community property and award spousal support. Following a four-day trial in 2021, the court settled the sizable estate, sanctioned Jacqueline for breaching her fiduciary by secretly transferring community assets, and ordered Jack to pay Jacqueline $13,000 in monthly spousal support. Jacqueline argues spousal support was set too low to permit her to save consistent with the marital status of living. She also challenges rulings on reimbursements, credits, and fiduciary breach. Jack seeks sanctions on appeal, arguing Jacqueline's claims ignore the trial court's findings and the applicable standards of review. While we deny the sanctions request, we agree that Jacqueline's claims largely overlook the court's credibility findings and attempt to reweigh the evidence in her favor. Viewing the evidence in the light most favorable to the *judgment*, we find no error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Jacqueline and Jack married in May 1992. During their 24-year marriage, the couple accumulated substantial assets through a combination of Jack's considerable earnings as a vascular trauma surgeon at Scripps Mercy Hospital, savings, and frugal living. Jacqueline had a bachelor's degree from University of California at San Diego in biochemistry, a business management degree from University of California at Irvine, and a master's degree in business administration from Webster University. After marriage, she primarily devoted her time to raising the couple's daughters (both adults

---

[1] We refer to the parties by their first names for clarity and intend no disrespect.

by the time of separation) while Jack focused on work. The couple owned two homes in Scripps Ranch—a home on Cypress Woods that they rented out, and their primary residence on Via Santa Brisa.

Starting in 2012, Jack enlisted the help of Jacqueline to build and grow his own separate medical practice. Jacqueline "was a dynamo" in negotiating contracts and securing patients, but juggling a private practice and a job at Mercy Hospital demanded grueling hours of Jack.

The parties separated in August 2016. In December, Jack filed for divorce. He estimated his gross monthly income from Scripps Mercy Hospital at $53,063 and business income of about $5,000 from his separate practice. Monthly expenses were around $25,000, which included $10,000 in monthly savings and $9,155 in college tuition for one of his adult children.

Asserting that Jacqueline was highly skilled, Jack filed a request for order (RFO) in 2017, seeking a vocational evaluation of her employment prospects. The parties stipulated that Kathleen Young would perform the evaluation. Eight months later, Jacqueline filed an RFO seeking temporary spousal support and a financial evaluation of Jack's since-shuttered private practice. She filed her first income and expense declaration at that time, claiming monthly wages of $1,480, rental income of $3,995, and monthly expenses of $59,968. She also requested $100,000 from Jack to cover attorney's fees. Jack agreed to pay temporary spousal support, but claimed Jacqueline had grossly inflated her living expenses, which he estimated at $12,000 per month. He felt Jacqueline should cover her own attorney's fees given her continued access to nearly $1 million in joint accounts and receipt of $114,955 of Jack's postseparation income.

The parties resolved these issues by stipulation in April 2018. Jack would pay Jacqueline $13,700 in monthly spousal support, with Jacqueline

receiving an advisement on becoming self-supporting. (Fam. Code,[2] § 4330, subd. (b); *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705 (*Gavron*).) The parties further agreed that Jack owed Jacqueline $41,100 in support arrears from January to March 2018, but that this figure would offset against the amount of Jack's separate income Jacqueline had received. Brian Brinig was selected as a joint expert under Evidence Code section 730 to evaluate the value of Jack's private practice and income available for permanent support. The parties selected a joint appraiser to evaluate the fair market value of their two homes and agreed that each side could access $25,000 from joint accounts to pay attorney's fees.

The court entered a status-only judgment dissolving the marriage as of September 19, 2018. Thereafter, the parties continued to litigate outstanding discovery disputes and attorney fee requests. In March 2019, Jack moved ex parte for a temporary restraining order freezing joint accounts, stating Jacqueline had failed to comply with a court order to account for community funds transferred during the marriage and after separation. In a supporting declaration, Jack estimated that Jacqueline had transferred over $800,000 out of community accounts and claimed a freeze was needed to protect his property rights. He asserted that Jacqueline had managed household finances during the marriage and maintained exclusive control of community accounts postseparation. The court granted Jack's request and set a review hearing. In anticipation of that hearing, Jacqueline filed a declaration explaining that she needed access to joint accounts to continue to pay Jack's personal and professional bills and expenses for their adult children, during a period in which Jack was not paying spousal support.

---

[2] Further undesignated statutory references are to the Family Code.

By June 2019, Jacqueline changed counsel a second time. In a supplemental income and expense declaration, Jacqueline listed temporary spousal support as her sole income and said her rental property operated at a loss. She estimated $44,543 in monthly expenses, including $4,000 per month in home maintenance, $1,500 for eating out, $2,000 for clothes, $5,000 for entertainment, gifts, and vacations, $2,500 for charitable contributions, and $5,000 for savings and investments. Ultimately, the parties stipulated to freeze certain bank accounts pending trial.

Remaining matters were set for trial in June 2021 before Judge Sharon Kalemkiarian. Jacqueline's counsel filed a request to be relieved, citing a breakdown in the attorney-client relationship, and Jacqueline retained her fourth attorney.

Leading up to trial in the spring of 2021, the parties submitted updated income and expense declarations. Jacqueline sought $49,517 to cover monthly expenses, which included $5,000 in savings and investments. She stipulated to undergo an updated vocational evaluation with Katherine Young. Jack filed a request for sanctions pursuant to section 271 for misappropriating community assets. He claimed that Jacqueline admitted at her May 11, 2021 deposition to transferring nearly $1 million in community funds to her parents' accounts and stated it cost him "no less than $45,635 to discover her misappropriations and seek Court intervention." He further claimed sanctions of $15,000 were warranted for Jacqueline's failure to participate in settlement negotiations. The sanctions motion was deferred to trial.

Each side filed trial briefs. Trial commenced on June 28, 2021 before Judge Kalemkiarian on Microsoft Teams. Over the course of the next four days, the court heard testimony from Jack, Jacqueline, jointly stipulated

5

experts Brinig and Young, Jacqueline's spousal support expert Joshua Vannetti, and Jack's tax expert Tony Yip. It issued a detailed, 28-page statement of decision in November 2021 covering spousal support, asset division, and sanctions for fiduciary breach.

Broadly speaking, the trial court credited testimony by Jack while discounting testimony by Jacqueline. It found Jacqueline had inflated her monthly expenses, had the ability to seek full time work, and breached her fiduciary duties by hiding community funds. Each of the court's specific rulings is discussed in turn in connection with the claims raised by Jacqueline on appeal.

DISCUSSION

A.    *Spousal Support*

Jacqueline challenges the trial court's decision to set permanent spousal support at $13,000 per month. This amount is too low, in her view, because Jack can pay more and the current award will not let her save at the same level as during the marriage. As we explain, the trial court carefully weighed the statutory criteria and considered Jacqueline's right to save. Jacqueline does not show a clear abuse of discretion.

Section 4320 sets forth fourteen statutory factors that a court must consider in ordering spousal support. These reflect not "a mélange of factors, but [rather] an expression of several policy preferences." (*In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 23.) While the marital status of living (§ 4320, subd. (a)) provides a reference point against which various other factors may be applied, it is not the benchmark for appropriate spousal support. (*In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 48.) Other factors the court must consider include the length of the marriage, age and health of the parties, ability of the supporting party to pay spousal

6

support, ability of the supported party to find gainful employment, each party's obligations and assets, each party's needs, the balance of hardships, and the goal that the supported party become self-supporting within a reasonable time period. (§ 4320, subds. (c)–(h), (k)–(l).) A catchall provision also allows the court to consider "[a]ny other factors" it deems "just and equitable." (*Id.*, subd. (n).)

The ultimate decision of whether to order spousal support, the amount and duration of support, and whether to retain spousal support jurisdiction rests within the trial court's broad discretion. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 479–480.) Also within the court's discretion is the appropriate weight to give any single statutory factor. (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 271.) Each case presents unique facts and equities, requiring the court to exercise its broad discretion to achieve substantial justice for the parties before it. (*Id.* at p. 269.) Consequently, a spousal support award will not be disturbed on appeal unless no reasonable judge would have made the same order under the circumstances. (*In re Marriage of Smith*, at p. 480.) We ask whether the court " 'exercised its discretion along legal lines' " and made findings supported by substantial evidence. (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1443.)

1. *Additional Background*

Judge Kalemkiarian ordered Jack to pay Jacqueline $13,000 in monthly spousal support effective August 1, 2021. As she explained, the judge had "great concerns about how Wife handled the financial affairs of the community," finding "no question that she hid transfers from her Husband." At the same time, Jacqueline "contributed greatly to Husband's earning capacity" and through her "prudent saving" helped accumulate "a lot in retirement and cash and investment accounts." The court commented that

7

Jacqueline was "a saver" and "has a right to save" and it did not "penalize [her] for the fact that she can get a lot of mileage out of a dollar." With a $13,000 spousal support award, the court believed Jack could also continue to save "at a pretty high rate."

The court declared that it considered all the section 4320 factors in setting spousal support. Although the parties lived a frugal existence during their marriage, they had a nice home, vacationed regularly, and sent their daughters to expensive schools while accumulating significant savings. As a result, the court found the marital status of living to be upper class. The parties had a long-term marriage with no minor children, and both parties were in good health. The balance of hardships favored Jacqueline because of Jack's higher earning capacity and ability to work at his current income for at least a few more years. In the court's view, each party's cash flow "will not be enough to spend what was spent during the marriage," but during the marriage the parties spent on private school for their daughters and saved significant sums.

Various income estimates were provided for Jack at trial, but the court credited the testimony of joint expert Brian Brinig that Jack earned $57,917 per month. Rejecting Jacqueline's alleged health limitations, the court found that she could work full-time. It believed there was a market for Jacqueline's skills as an interpreter and medical biller, and highlighted her college degrees, postseparation return to school, and launch of a new business. "[B]ased upon her earning history and the assets she will have from the marriage," the court imputed income to Jacqueline at $3,000 per month. By assets, it meant the parties' two homes, assigned to Jacqueline at her option to refinance or sell the remaining debt, as well as multiple bank accounts and

8

investment accounts.[3]  After the property division, Jack would have about $5 million in assets, while Jacqueline had about $3 million.  These amounts were exclusive of retirement savings.

Turning to expenses, the court believed "the parties' living expenses were modest; around $20,000 per month at most, but that included private education for the children and a significant savings plan."  In the court's view, Jacqueline had "really inflated her living expenses in her Income and Expense Declaration" in claiming $49,000 in monthly expenses, rendering her testimony less believable.[4]

Jack's earning capacity was much higher than Jacqueline's, "upwards of $700,000 per year" and "sufficient to maintain the marital standard of living" for him.  He also had substantial assets following the property division and minimal monthly expenses outside $10,000 in reported monthly savings and $19,000 for his daughter's expenses.  The court believed Jack was "saving at a high rate and will still be able to save even with this support award."[5]  While Jacqueline could not maintain the marital standard of living on her

---

[3]    The Via Santa Brisa home was valued at $2,150,000 with $316,620 in outstanding mortgage debt, while the Cypress Woods rental property was valued at $1,350,000 with $239,848 in outstanding debt.

[4]    Jack explained at trial that the couple lived a frugal existence, conserving electricity and hot water and rarely buying clothes.  He contested the amounts Jacqueline claimed to spend on home repairs, gifts and vacations, clothes, and charitable contributions.

[5]    The trial court addressed the remaining section 4320 factors as well, finding Jacqueline contributed to advancing Jack's career (§ 4320, subd. (b)) and concluding there were no relevant tax consequences (*id.*, subd. (j)), history of domestic violence (*id.*, subd. (i)), or criminal convictions (*id.*, subd. (m)) to consider.

income and investments alone, she could do so after factoring in $13,000 in monthly spousal support.

### 2. *Analysis*

Jacqueline raises several related challenges to the court's spousal support award. First, she claims the court failed to consider the marital standard of living. With the court finding they lived an upper-class lifestyle, she claims she cannot meet the marital standard of living with $13,000 in support while Jack can do so *and* continue to save $10,000 per month.

Next, Jacqueline argues spousal support should have been higher given the court's acknowledgement in pronouncing its proposed statement of decision that Jack could pay more.[6] She faults the trial court for allegedly failing to determine what her reasonable needs actually were in light of the marital standard of living. In Jacqueline's view, the support award would not permit her to continue to save consistent with the marital standard of living.

Jacqueline raises other issues with the support award too. She challenges the express finding that she could work full time, claiming the court failed to adequately consider her health issues. Even if she could find employment, she believes the trial court failed to consider whether she could become self-sufficient "at the accustomed marital standard." Jacqueline maintains that the imbalance in asset allocation ($5 million to Jack and $3 million to Jacqueline) further supports an increased support award. She

---

6    The court issued a proposed statement of decision at the end of the case awarding Jacqueline $12,000 in monthly spousal support. It stated that given Jack's income, it "could have gone higher" but proceeded to explain why the award was reasonable. The record is not clear on the reasons why, but the court ultimately increased the award to $13,000 per month in its final statement of decision.

10

faults the court for failing to consider all *other* factors under the statutory catchall (§ 4320, subd. (n)), namely the inequity of leaving Jack in a disproportionately higher standard of living than Jacqueline. She maintains that Jack can continue to live the "same lifestyle" and "aggressively" save for retirement with this support award while Jacqueline could not.

These claims are essentially variations on a theme. Jacqueline believes Jack can afford to pay and should pay more to enable her to save consistent with the marital standard of living. In her view, the current support award leaves the parties on an unequal playing field—Jack can continue to save aggressively while Jacqueline cannot. Her argument fails for a number of reasons.

First, Jacqueline ignores the court's factual findings and impermissibly attempts to recast the evidence in her favor. She asserts in her brief that the marital standard of living was $48,000 in "net spendable income," reflecting gross monthly income of $76,518 reduced by a 37 percent effective tax rate. While this may have been her position at trial, the court credited Brinig's testimony instead. Brinig excluded Jack's 2015 income as an outlier and calculated his adjusted gross income for support at $57,917 per month.[7] Likewise, the court did not find Jacqueline's expense estimates credible. It believed the parties spent $20,000 per month during the marriage, which

---

[7]    At trial, Jack explained that with Jacqueline's help, he operated a thriving private practice in 2015 but worked grueling 120-hour work weeks. Earning capacity for support purposes "generally should not be based upon an extraordinary work regimen, but instead upon an objectively reasonable work regimen as it would exist at the time the determination of support is made." (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 234−235.)

11

included private education for their daughters and significant savings.[8] Jack previously paid college tuition of $9,177 per month for the couple's two adult daughters, suggesting around $11,000 in monthly expenses (including savings) would maintain the marital standard of living.[9]

While Jacqueline claimed she was unable to work, the court found her "in good health" and able to work full time. Contrary to Jacqueline's claim that the court disregarded her medical evidence, it expressly considered Jacqueline's testimony and doctors' notes—"The evidence presented was two notes from two doctors who said she could not work and one doctor who said that she could."[10] Based on her postseparation earnings history, the court concluded Jacqueline could earn $3,000 per month in income and investment

---

[8] Jacqueline reads this quote to mean that the court assumed her reasonable needs postmarriage *did not include* savings. As we read it, the court was simply stating that the parties' expenses were modest outside of their savings and educational expenditures.

[9] We disagree that the court failed to make specific findings as to Jacqueline's reasonable needs. In rejecting her expense figures as inflated and finding the parties spent $20,000 per month inclusive of savings and educational expenses, the court implicitly credited Jack's submissions in determining her needs.

[10] Jacqueline did not transmit exhibits with her appeal. Our record includes a May 2018 declaration by Jacqueline's doctor stating she "currently is unable to work" because of "ongoing mental and physical health issues." But we lack the other doctor's notes referenced by the trial court, and it was Jacqueline's duty to furnish a record adequate for review. (*In re Marriage of Wilcox* (2004) 124 Cal.App.4th 492, 498.)

12

returns.[11]  These returns presumably included income from the Cypress Woods property, which in 2017 generated $3,995 per month in rent.

Second, Jacqueline fails to show any misapplication of legal standards in setting spousal support. She is correct that a court must consider the parties' savings history during marriage in evaluating their marital standard of living for spousal support.  (*In re Drapeau* (2001) 93 Cal.App.4th 1086, 1098 (*Drapeau*).)  But by every indication, the trial court did so here.  It stated Jacqueline "has a right to save, and that she is a saver."[12]  It noted elsewhere in its statement of decision that Jacqueline "saved a considerable amount of money since separation" (while admitting this "could have been" transferred from community assets).  With $13,000 in monthly spousal support and $3,000 in monthly income and investment returns, the court believed that Jacqueline "will be able to maintain the marital standard of living."  Given our deferential substantial evidence review, we cannot say the trial court ignored Jacqueline's right to save in setting spousal support.

The real question is whether the support award results in vastly different abilities to save between the parties and, if it does, whether this disparity amounts to an abuse of discretion.  Relevant to this inquiry is a major change in the Internal Revenue Code giving Jacqueline more mileage from each spousal support dollar.  Previously, spousal support was considered tax deductible to the payor spouse and counted as taxable income for the

---

[11]  Vocational expert Kathleen Young opined in 2017 that Jacqueline could earn between $60,000 and $80,000 in practice management.  Relying on a doctor note not credited by the trial court and the longer length of time since Jacqueline had been employed, Young concluded by the time of trial that Jacqueline could only earn $16 to $24 per hour in bookkeeping or accounting, health permitting.

[12]  In orally providing its proposed statement of decision, the court stated that Jacqueline "does have the right to save, just as he does."

payee spouse. This remains true for purposes of California income taxes. But for spousal support orders entered on or after January 1, 2019 (like the one at issue here), the reverse is now true for federal income taxes under the Tax Cuts and Jobs Act of 2017 (Pub.L. 115-97). The payor spouse can no longer deduct alimony payments on federal income tax forms, while the payee spouse does not need to report the payments as income. (See generally, Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2023) ¶ 6.925; see, e.g., Judicial Branch of California, Taxes and spousal support, California Courts Self-Help Guide.[13])

The court's statement of decision does not lay out the math, and exhibits were not transmitted on appeal. But the record reflects that the court fully considered the parties' respective incomes, adjusted for spousal support and taxes. It found that the parties spent a modest $20,000 per month—but this included private education for the couple's adult children paid for by Jack and estimated around $9,000 per month. The balance of $11,000 in monthly expenses reflected "a significant savings plan" during marriage. Using this as a reference point, Jacqueline can still save at levels consistent with the marital standard of living. Even if Jack can save more, this is not a circumstance where one party is left in poverty and the other in relevant comfort. (See, e.g., *In re Marriage of Andreen* (1978) 76 Cal.App.3d 667, 671−672 (*Andreen*).)

It may be " 'just and equitable' " for a court to award spousal support in an amount sufficient to enable the supported spouse to continue saving at the same rate as during the marriage, depending on other statutory factors. (*Drapeau, supra,* 93 Cal.App.4th at p. 1097, fn. 16.) "This does not mean, of

---

13    <https://selfhelp.courts.ca.gov/divorce/spousal-support/taxes> [as of August 25, 2023] archived at <https://perma.cc/GB8E-P4WT>.

course, that a supported spouse is necessarily 'entitled' to support at a level that will allow for savings at a particular rate." (Cal. Prac. Guide: Family Law, *supra*, ¶6:951.3.)  The court found that Jacqueline could maintain the marital standard of living at $13,000 per month of support, in addition to "her earnings, and a return on her investments" totaling $3,000.[14]  The record does not foreclose such a conclusion.  That Jacqueline disagrees with the court's finding as to typical spending during the marriage or thinks Jack can afford to pay more (§ 4320, subd. (c)) does not establish an abuse of the trial court's broad discretion.  We read the court's comment that the tentative $12,000 permanent spousal support award "could have gone higher" given Jack's income to mean simply that the ultimate award reflected a careful balancing of relevant factors.

Jacqueline walks away with $3 million in assets to Jack's $5 million.[15] She believes this "huge imbalance" strongly favors a more generous spousal support award and deems it "inequitable" to allow Jack a disproportionately higher standard of living.  (See, e.g., *Andreen, supra,* 76 Cal.App.3d at pp. 671−672; *In re Marriage of McNaughton* (1983) 145 Cal.App.3d 845, 851−852.)  "[W]e agree that it would be an abuse of discretion to order

---

[14]    We do not agree with Jacqueline that she was expected to dip into her savings to maintain her marital standard of living.  The Cypress Woods property, for example, was used as a rental and assigned to Jacqueline at divorce.  In 2017, Jacqueline earned $3,995 per month in rental income from this property.  Once Jacqueline refinanced the outstanding mortgage balance, she could ostensibly set rent at a level that would give her a good net return without touching her existing savings.

[15]    In addition to an equalization payment of $1,844,079, Jacqueline was to pay Jack $658,655 for reimbursement, sanctions for fiduciary breach, and sanctions for frustrating settlement efforts.  Jack also had a separate property condominium that he purchased postseparation with his inheritance, as well as a medical practice valued at $210,000.

support which leaves the supported spouse at a standard of living significantly lower than that enjoyed during marriage while allowing the supporting spouse a significantly higher one.  [Citations.]  If the supported spouse receives an amount sufficient to maintain the marital standard of living, however, the fact that postseparation earnings allow the supporting spouse to maintain a higher one does not invalidate the award." (*In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 568.)  That is the scenario here, where Jacqueline has not demonstrated that the court's order left her below the marital standard of living.  (See *In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 210.)  Moreover, "[a]lthough the law protected [Jacqueline] from a precipitous drop in her standard of living after her divorce, it did not guarantee her dollar-for-dollar equality between her postseparation income and [Jack's]." (*Id.* at p. 209.)

Simply put, the trial court balanced all the statutory factors in setting a permanent spousal support award and expressly referenced Jacqueline's right to save.  Although Jacqueline undoubtedly believes a greater award is warranted, she fails to show an abuse of discretion.

B. *Epstein Credits*

" '[A]s a general rule, a spouse who, after separation of the parties, uses earnings or other separate funds to pay preexisting community obligations should be reimbursed therefor out of the community property upon dissolution.' " (*In re Marriage of Epstein* (1979) 24 Cal.3d 76, 84 (*Epstein*); see § 2626.)  To receive reimbursement of so-called "*Epstein* credits," the requesting spouse must show that separate property funds were in fact used to pay for postseparation community expenses.  "[I]f the managing spouse uses community money to pay a community obligation, there is no basis for reimbursing the spouse for that payment." (*In re Marriage of Prentis-*

16

*Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1280.) We review a court's denial of a request for *Epstein* credits for abuse of discretion. (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 318–319 (*Oliverez*).)

Jacqueline contends the court failed to consider *Epstein* credits in splitting the community assets evenly. She claims the court should have reimbursed her for community expenses that she covered between separation and issuance of temporary spousal support (August 2016 to April 2018). Specifically, she seeks reimbursement for expenses associated with the two homes (including a property management fee on the rental to compensate for her time), health insurance premiums for Jack's private practice, timeshare payments, their daughter's college tuition, and payments into a 401k account linked to the private practice.

During trial, Jacqueline testified about her postseparation payments toward the homes and timeshares. Her testimony consisted of ballpark estimates ("About 2,900," "Over $10,000," etc.) and references to Exhibit 212 which reflected these claimed expenditures. The court advised Jacqueline's counsel that it would not issue credits "just based on testimony." Without trial exhibits in our record, we cannot ascertain that Jacqueline ever sought reimbursement for college tuition payments, health insurance payments, or 401k payments for Jack's practice. (See Cal. Rules of Court, rule 8.204(a)(1)(C) [contentions must be supported by record citations].)

At the close of trial, Jacqueline's counsel offered Exhibit 212 into evidence, but acknowledged it "admittedly . . . is not your standard *Epstein* credit." The exhibit listed community expenses for mortgage, taxes, utilities, and maintenance of the two homes and postseparation timeshare payments. Counsel acknowledged that the payments came out of community funds but

asserted "there should be some accounting" for expenses made in the period before she started receiving spousal support.

Orally providing its proposed statement of decision, the court stated its understanding that Jack covered all postseparation property tax payments but invited clarification from the parties. Jacqueline filed objections to the proposed statement of decision and claimed to have made postseparation property tax payments. She attached Exhibit 224, which was not introduced at trial. The court held a short posttrial hearing on this matter. Because Exhibit 224 was not proffered at trial, the court declined to consider it. It did, however, consider Exhibit 212. Based on its review, it credited Jacqueline with four property tax payments she made after separation. Although these payments came from a joint account, the deposits in the account were taken from an account assigned to Jacqueline at a date of separation value, making those deposits her separate property. In total, it credited Jacqueline $34,919 for these payments.

From this record, the trial court was plainly aware of its obligation to reimburse Jacqueline for postseparation community expenses paid from her separate funds. It did not err in refusing to consider evidence presented for the first time after trial ended. (See *Houghton v. Lawton* (1923) 63 Cal.App. 218, 224.) Nor did it err in requiring more than vague ballpark testimony of expenses paid. Jacqueline did not transmit trial exhibits on appeal, making it impossible for us to determine whether the court's ruling was reasonable given the evidence presented in Exhibit 212. But from the record before us, it appears the trial court applied correct legal standards and awarded any *Epstein* credits due. There is no basis under these circumstances to find an abuse of discretion in denying additional *Epstein* credits. (See *Oliverez, supra,* 33 Cal.App.5th at p. 320.)

18

C.    *Payroll Reimbursements*

Next, Jacqueline challenges the order that she reimburse Jack for $114,592. This reflected Jack's postseparation payroll income in the form of four checks received by Jacqueline and deposited into her separate account. Pursuant to the parties' stipulation, the court offset this amount by $41,000 in spousal support arrears due to Jacqueline from January to March 2018.

Jacqueline seems to suggest that this payroll income constituted community property because it was acquired while the parties remained "legally married." She purports to rely on the general rule that all property acquired during the marriage is presumed to be community property. (See § 760; *In re Brace* (2020) 9 Cal.5th 903, 914.) As *Brace* recognizes, however, there is a special rule applicable to earned income after separation, but before termination, of the marriage. Those earnings are the separate property of that spouse. (§ 771, subd. (a); *Brace, supra,* at p. 914.) To the extent Jacqueline means to say that the funds from which those payroll checks were drawn were already in a community business account before the parties separated, making these funds community property even though they came to her after separation, the trial could reasonably reject that factual premise.

We review the court's characterization of property as separate or community property for substantial evidence. (*In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472.) The testimony of a single witness is sufficient for substantial evidence review. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 (*Mix*).)

Analyzing the payments, accountant Yip testified at trial "that the total of $114,952 is Dr. Yang's separate property income" but went to Jacqueline's separate property account, giving rise to a reimbursement claim. This was true even though the payroll checks reflected work done in the prior month,

19

and despite the fact that the checks automatically originated from a business account. Yip also addressed Jacqueline's claim that she paid payroll expenses for the business after the parties separated. Given the numerous transfers back and forth between accounts, Yip applied a holistic approach, evaluating the postseparation payroll income Jacqueline received against the business expenses. While Jacqueline may have paid payroll expenses after separation, Jack paid the bulk of expenses for the practice in terms of rent and utilities. Because postseparation expenses covered by Jacqueline added up to "a much, much smaller number" when compared to the income she retained or business expenses covered by Jack, Yip concluded that all of the payroll income was properly reimbursed to Jack.

The court believed Yip, stating it found his "approach persuasive, and his testimony credible and careful." We do not disturb the court's credibility determination on appeal. Substantial evidence therefore supports its decision to require Jacqueline to reimburse Jack the full $114,952 in postseparation payroll income without credit for community business expenses she covered.

A similar analysis applies to the postseparation payments to the private practice that were received by *Jack*. On direct examination, Jacqueline testified that a series of checks listed in Exhibit 213 were received by Jack after separation, reflecting payments for patient care. Because such payments could come months after the date of service, Jacqueline argued the checks received by Jack were community property. Jack gave a different account, describing several checks as being for work on hospital committees or service as an expert witness after separation. According to Jack, only one check—from February 2017—might have pertained to patient care provided before the parties' August 2016 separation. It generally took three months

from the date of service to get paid from insurance or billing companies, not the year suggested by Jacqueline.

The court recognized that this was a contested issue and concluded four separate checks totaling $80,708 (or $45,439 after deducting taxes) were community property subject to division. Jacqueline claimed more of the postseparation checks should be deemed community property, but the court weighed her testimony against Jack's and found Jack's "explanation of the checks more credible." The court did not, as Jacqueline asserts, *disregard* the remaining checks. It simply concluded these were not community property requiring reimbursement. Jacqueline implies the court should have given her testimony more weight because she was the primary medical biller for the practice. But on substantial evidence review, we do not reweigh the evidence or second-guess the trial court's credibility determinations.[16]

D.    *Breach of Fiduciary Duty*

Finally, Jacqueline argues insufficient evidence supports the court's finding that she violated her fiduciary duties under section 1101, subdivision (f) and section 217, subdivision (c) by making multiple transfers of community property funds into accounts outside Jack's control and without his knowledge.[17] The court believed Jacqueline made these transfers to hide

---

[16]    Jacqueline objected to deducting taxes from her reimbursements, but the court found this deduction warranted where Jack or the community paid federal and state taxes on this income. In her opening brief, Jacqueline suggested this resulted in double-taxing her community share because the parties filed taxes jointly in 2016; she claims she was entitled to half the *gross* amount in the checks at issue. Frankly this argument makes little sense. In seeking half the *pre-tax* amounts where taxes were already paid by Jack or the community, it is *Jacqueline* who seeks "an unwarranted tax benefit."

21

money. The largest of these sums was a transfer of $870,000 at a time when Jacqueline was consulting with attorneys, making the court wonder if she did so in anticipation of filing for divorce.

Because she testified that she transferred community funds to her parents' accounts to protect the family, which included Jack, Jacqueline maintains the court's finding is unsupported by the evidence. But as Jack points out, the court expressly rejected this argument, disbelieving Jacqueline's explanation that she made the transfers without Jack knowing because he had been financially reckless. Nor did it believe Jacqueline's testimony that she did not know the monetary transfers were not disclosed or forgot about accounts in signing financial disclosures. It was Jacqueline's word against Jack's, and the court was free to disbelieve her. We do not second guess the court's credibility determinations on substantial evidence review. (See *Mix, supra,* 14 Cal.3d at p. 614; *In re Marriage of DeSouza* (2020) 54 Cal.App.5th 25, 33.)

Despite finding a fiduciary breach, the court did not conclude there was fraud or malice given Jacqueline's attempts to communicate with Jack about the transfers. Accordingly, it only required Jacqueline to pay Jack half the value of the transferred funds, or $435,000, pursuant to section 1101,

---

17 "Section 1101 creates a right of action and specific remedies for the breach of a spouse's fiduciary duty 'that results in impairment to the claimant spouse's present undivided one-half interest in the community estate.' " (*In re Marriage of Schliech* (2017) 8 Cal.App.5th 267, 277.) Pursuant to section 1101, subdivision (g): "Remedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty *plus attorney's fees* and court costs." (Italics added.)

subdivision (g). It also required her to pay $100,000 in attorney's fees to Jack.

Jacqueline argues the court abused its discretion in ordering $100,000 in attorney's fees where Jack claimed he incurred only $45,635 to discover her secret transfers of community assets. True enough, Jack stated in his trial brief that he incurred $15,635 in connection with his motions to freeze certain accounts, as well as $30,000 to discover her misappropriation through discovery demands and subpoenas. But this says nothing of the expense required to prove up this contested issue at trial. Jack claimed to have spent an additional $104,086 on attorney's fees from January through April 2021 to prepare for trial, at which Jacqueline's alleged fiduciary breach played a central role. These figures did not cover expenses in June, or $50,000 in anticipated legal fees to prepare his experts for trial. Given these additional significant expenses, we cannot say the court abused its discretion in awarding Jack $100,000 in attorney's fees pursuant to section 1101, subdivision (g).

E.    *Jack's Request for Sanctions on Appeal*

Labeling this appeal a "futile exercise" that "never should have been brought to begin with," Jack seeks an award of sanctions payable to him and this Court. In some respects, we agree that Jacqueline's appeal presents an exercise in futility, with her arguments inviting the court to second guess credibility determinations or reweigh the evidence. Even so, we cannot deem all of her arguments frivolous. But given some arguable ambiguity in the statement of decision, it is understandable that Jacqueline might ask whether the court adequately considered her right to save. Likewise, Jacqueline could reasonably question how the court could impose $100,000 in

attorney's fees where less than half that amount was needed to discover her fiduciary breach.

"[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) Courts must use this power "most sparingly to deter only the most egregious conduct" given the potential chilling effect in taking an appeal. (*Id.* at pp. 650−651.) Because we cannot say that any reasonable attorney would find this appeal totally and completely without merit, we deny the sanctions request.

DISPOSITION

The judgment is affirmed. Jack is entitled to his costs on appeal.


DATO, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.

24